IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————— )
NICHOLAS G. BELEZOS, on behalf of ) CIVIL ACTION NO.
himself and all others similarly situated, ) 1:17-cv-12570-FDS
 )
            Plaintiffs, )
v. ) **FIRST AMENDED COMPLAINT**
 )
BOARD OF SELECTMEN of ) **(CLASS ACTION)**
Hingham, Massachusetts, )
in their official capacity, ) **DEMAND FOR JURY TRIAL**
on behalf of themselves and )
all others similarly situated, )
 )
            Defendants )
———————————————————— )

**INTRODUCTION**

1.     Plaintiff Nicholas G. Belezos, individually and on behalf of himself and a class of all other persons similarly situated, brings this civil class action for declaratory, legal, equitable and other relief pursuant to the Fourteenth Amendment to the United States Constitution as secured by 42 U.S.C. § 1983, and under the statutes and regulatory standards of the Commonwealth of Massachusetts – including Mass. Gen. L. ch. 90, § 18 (and set forth in Mass. Gen. L. ch. 85, § 2), the Massachusetts Department of Transportation Highway Division's "Procedures for Speed Zoning on State and Municipal Roads" and "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices" - against the Board of Selectmen of Hingham, Massachusetts, in their official capacity, on behalf of themselves and a class of all others similarly situated.

**JURISDICTION**

2.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 2201. Federal question jurisdiction arises pursuant to 42 U.S.C. § 1983.  This complaint also alleges statutory and regulatory standards violations of the Commonwealth of Massachusetts.  Supplemental jurisdiction arises pursuant to 28 U.S.C. § 1367, and the principals of supplemental jurisdiction.  The federal and state law claims arise out of a common nucleus of operative facts, and the entire suit commenced by this complaint would ordinarily be tried in one judicial proceeding.  The exercise of supplemental jurisdiction will avoid duplication and multiplicity of action, and will promote the interests of judicial economy and fairness.

**VENUE**

3.      Venue is proper in this Court based upon 28 U.S.C § 1391, in that a substantial part of the events or omissions giving rise to the claims occurred in this district as alleged below.  In addition, the Defendant Board of Selectmen of Hingham, Massachusetts, maintains its principal place of business in this district.

**PARTIES**

4.      Plaintiff Nicholas G. Belezos (hereinafter "Mr. Belezos"), is an individual residing at all relevant times at 2 Puritan Road, Hingham, Plymouth County, Massachusetts 02043.

5.      Defendant Board of Selectmen (hereinafter "Selectmen") of Hingham, Massachusetts (hereinafter "Town" or "Hingham"), are the Chief Elected and Executive

Officers of the Town, having their principal office at 210 Central Street, Hingham, Plymouth County, Massachusetts 02043.  The Town is a municipal corporation organized under the laws of the Commonwealth of Massachusetts.  The Selectmen are vested with all the municipal authority that is not specifically retained by the Town's legislative body, Town Meeting, or other elected boards.   The Selectmen adopt Town administrative policies, make special regulations as to the speed of motor vehicles, and act as Police Commissioner.  They appoint and supervise the Town Administrator, the Superintendent of Public Works and the Chief of Police.  The Selectmen are hereby sued in their official capacity for declaratory, legal, equitable and other relief.

## **BACKGROUND**

6.     Mass.  Gen. L. ch. 85, § 2, as amended through St. 1986, c. 689, § 3, entitled "Traffic signs or devices; erection and maintenance; rules and regulations," is the enabling statute that authorizes cities and towns to erect and maintain traffic signs within their jurisdiction.   With respect to speed control signs (a/k/a speed limit signs), it expressly provides in pertinent part, "*speed control signs may be established only in accordance with the provisions of section eighteen of chapter ninety*."  (emphasis added).

7.     Mass. Gen. L. ch. 90, § 18, as amended through St. 1986, c. 689, §§ 8-9, entitled "Special regulations, speed and use of vehicles," is the enabling statute that authorizes cities and towns to "make special regulations as to the speed of motor vehicles" within their jurisdiction subject to the approval of the Massachusetts Department of Transportation ("Department" or "MassDOT") and the Registrar of Motor Vehicles ("RMV").  (See Exhibit No. 1, infra, at A2-A3).  "No such special speed

regulation shall be effective until there shall have been erected ... _signs conforming to standards adopted by the department_, setting forth the speed or other restrictions established by the regulation."  (Id.) (emphasis added).

8.      In accordance with the authority granted by Mass. Gen. L. ch. 90, § 18 (and set forth in Mass. Gen. L. ch. 85, § 2), the Highway Division of MassDOT (hereinafter "MassHwy") promulgated regulatory standards entitled "Procedures for Speed Zoning on State and Municipal Roads."  (Exhibit No. 1).

   a.   With respect to Mass. Gen. L. ch. 90, § 18, it provides in pertinent part:

_Chapter 90, Section 18 authorizes the posting of numerical speed limits on all roadways in Massachusetts._  The foundation for the actual posting of a speed limit is a thorough traffic engineering study.  After a study has been completed, a Special Speed Regulation is drafted and approved by the governing authority of the roadway, the Registry of Motor Vehicles and MassDOT.   All posted regulatory speed limit signs must adhere to this approval process.  _If a speed limit is posted without this procedure, it is in violation of Chapter 90, Section 18, and is therefore considered illegal and unenforceable_.

"Procedures for Speed Zoning on State and Municipal Roads," 3-4 (2012) (emphasis added) (Exhibit No. 1, supra, at 3-4).

   b.   With respect to special speed regulations, it provides in pertinent part:

Following the determination of the appropriate speed zones and the subsequent approval by the Boston Office, a Special Speed Regulation will be drafted by the Boston Office Speed Zoning Section to be signed by the Chief Deputy Registrar for the Registry of Motor Vehicles and the State Traffic Engineer for MassDOT. In the case of a City or Town regulation, the Special Speed Regulation must first be adopted by the appropriate City or Town officials before being approved by Registry and MassDOT officials. (see Speed Control Flow Charts, fig. 6a & 6b). _After the regulation is adopted by all of the previously mentioned agencies, the authority in control of the subject roadway may then proceed with the erection of the appropriate speed limit signs at which point the regulation then becomes legal and enforceable._

4

(Id. at 19-20) (emphasis added).

**SPEED LIMIT PROCEDURE ON MUNICIPAL ROADWAYS**

TOWN REGULATIONS



(Id., fig. 6a, at 20).

    c.  With respect to speed limit ("Speed Limit") signs, it expressly defines them as follows:

_Speed Limit signs are_ rectangular in shape, with black numerals on a white reflectorized background. (see fig. 7).

(Id. at 21-22) (emphasis added).



(Id., fig. 7, at 22).

    d.  With respect to advisory speed ("Advisory Speed") plaques, it expressly provides in pertinent part:

Section 2C-08 of the 2009 Manual on Uniform Traffic Control Devices (M.U.T.C.D.) states:

Section 2C.08 Advisory Speed Plaque (W13-1P) [rectangular in shape, with black numerals on a yellow reflectorized background, as shown below in M.U.T.C.D.]



**W13-1**
**Advisory Speed plaque**

Option:

01 The Advisory Speed (W13-1P) plaque (see Figure 2C-1) may be used to supplement any warning sign to indicate the advisory speed for a condition.



Standard:

02 The use of the Advisory Speed plaque for horizontal curves shall be in accordance with the information shown in Table 2C-5.  The Advisory Speed plaque shall also be used where an engineering study indicates a need to advise road users of the advisory speed for other roadway conditions.

03 If used, the Advisory Speed plaque shall carry the message XX MPH.  The speed displayed shall be a multiple of 5 mph.

04 Except in emergencies or when the condition is temporary, *an Advisory Speed plaque shall not be installed until the advisory speed has been determined by an engineering study.*

05 *The Advisory Speed plaque shall only be used to supplement a warning sign* and *shall not be installed as a separate sign installation.*

06 *The advisory speed shall be determined by an engineering study that follows established engineering practices.*

7

> *Unlike regulatory speed signs, advisory speed signs can be erected by municipalities without any further approval provided they comply with the M.U.T.C.D. Also, advisory speeds are not enforceable, since their intent is to advise motorists of an appropriate speed through a particular condition, not regulate it.*

(Id. at 18-19; fig. 2C-1) (emphasis added) (comments added in brackets).

9.     Mass.  Gen. L. ch. 85, § 2, expressly authorizes cities and towns to erect and maintain traffic signs (except speed control signs (a/k/a speed limit signs)) "on any way within its control" without MassDOT approval "provided such signs ... are in conformance with the department's current manual on uniform traffic control devices...".

10.     In accordance with the authority granted by Mass. Gen. L. ch. 85, § 2, MassHwy promulgated regulatory standards entitled "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices."  (Exhibit No. 2).  With respect to speed control and "official" Speed Limit signs, it expressly provides in pertinent part:

**Section 10A-8** **Speed Control**: Of the special regulations adopted by municipalities under the provisions of Chapter 90, Section 18 of the General Laws, the most commonly used is the special regulation of the speed of motor vehicles. Considerable data including speed observations and trial runs must be obtained by municipal officials, usually the Police Department. The final determination is based upon the *85-percentile method*, which is that speed at or below which 85% of the vehicles observed were actually traveling. Department representatives are available to demonstrate the proper method for conducting the necessary studies and drafting the covering regulation, upon written request of local officials.

Procedure for Establishment of Legal Speed Zones

(1) The municipality is to conduct proper studies and submit data to the Department. (Municipalities usually accept the available services of the Department in conducting studies and assembling the data).

(2) After the speed zones, proposed by the local authorities, are reviewed by the Department, they are returned to the municipality for formal adoption by the rule-

8

making body.  During this time, the municipality is responsible for any and all hearings required for adoption.

(3) Upon receipt of notice of formal adoption by the municipality, the Department, acting jointly with the Registry, will certify and approve.

(4) Certified regulation is returned to municipality.

(5) *Official Speed Limit signs may then be installed in accordance with the specific provisions of the approved speed regulation.*

(6) *The Special Speed Regulation is then enforceable against violators.*

"The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8, 10-11 (January 2012) (emphasis added).  (Exhibit No. 2, supra, at 10-11).

11.     Mass. Gen. L. ch. 90, § 17, as amended through St. 1986, c. 689, § 7, entitled "Speed Limits," expressly provides in pertinent part:

[1] *No person operating a motor vehicle on any way shall run it at a rate of speed greater than is reasonable and proper, having regard to traffic and the use of the way and the safety of the public.* [2] *Unless a way is otherwise posted in accordance with the provisions of section eighteen*, it shall be prima facie evidence of a rate of speed greater than is reasonable and proper as aforesaid (1) if a motor vehicle is operated on a divided highway outside a thickly settled or business district at a rate of speed exceeding fifty miles per hour for a distance of a quarter of a mile, or (2) on any other way outside a thickly settled or business district at a rate of speed exceeding forty miles per hour for a distance of a quarter of a mile, or (3) inside a thickly settled or business district at a rate of speed exceeding thirty miles per hour for a distance of one-eighth of a mile, or (4) within a school zone which may be established by a city or town as provided in section two of chapter eighty-five at a rate of speed exceeding twenty miles per hour. ... [4] *If a speed limit has been duly established upon any way, in accordance with the provisions of said section, operation of a motor vehicle at a rate of speed in excess of such limit shall be prima facie evidence that such speed is greater than is reasonable and proper ....*

Mass. Gen. L. ch. 90, § 17 (sentence numbers added in brackets) (emphasis added) (See Exhibit No. 1, supra, at A1).

12.     With respect to Mass. Gen. L. ch. 90, § 17, the "Procedures for Speed Zoning on State and Municipal Roads" regulatory standards provide in pertinent part:

> *Chapter 90, Section 17 governs the speed of motor vehicles on unposted roadways.*  The speed limits on roadways that fall into this category are often referred to as "prima facie" speed limits.  The present prima facie speed limits according to Chapter 90, Section 17 are condensed below:
>
> > ….it shall be prima facie evidence of a rate of speed greater than is reasonable and proper if a motor vehicle is operated in excess of:
> >
> > 1.  50 miles per hour on a divided highway outside of a thickly settled or business district for a distance of ¼ of a mile.
> >
> > 2.  40 miles per hour on an undivided highway outside of a thickly settled or business district for a distance of ¼ of a mile.
> >
> > 3.  30 miles per hour in a thickly settled or business district for a distance of 1/8 of a mile.
> >
> > 4.  20 miles per hour in a legally established school zone.
>
> Note the distance requirements associated with the enforcement of Chapter 90, Section 17.  Instantaneous radar or laser readings are not adequate.  The motor vehicle must be shown to have been in excess of these speed limits for the entire distance associated with each respective speed limit.  Also, *prima facie speed limits cannot be posted, with the exception of a legally established school zone.*
>
> The definition of a "thickly settled or business district" is as follows: "The territory contiguous to any way which is built up with structures devoted to business, or the territory contiguous to any way where dwelling houses are situated at such distances as will average less than two hundred feet between them for a distance of a quarter of a mile or over."

"Procedures for Speed Zoning on State and Municipal Roads," 3 (2012) (emphasis added) (Exhibit No. 1, supra, at 3).

13.    Mass. Gen. L. ch. 90, § 20, entitled "Penalties and Punishments," provides punishments for persons convicted of a violation of Mass. Gen. L. ch. 90.  With respect to punishment of persons convicted of violations of Mass. Gen. L. ch. 90, §§ 17 and 18, it expressly provides in pertinent part:

> Any person convicted of a violation of the provisions of section seventeen, or of *a violation of a special regulation lawfully made under the authority of section eighteen shall be punished by a fine of not less than fifty dollars*.  Where said conviction is for operating a vehicle at a rate of speed exceeding ten miles per hour over the speed limit for the way upon which the person was operating, *an additional fine of ten dollars for each mile per hour in excess of the ten miles per hour shall be assessed.* ...

> ... There shall be a surcharge of $50 on a fine assessed against a person convicted or found responsible of a violation of section 17 or *a violation of a special regulation lawfully made under the authority of section 18*.  The first $50.00 of each surcharge shall be transferred by the registrar of motor vehicles to the state treasurer for deposit into the Head Injury Treatment Services Trust Fund.

Mass. Gen. L. ch. 90, § 20  (emphasis added).

14.    Mass. Gen. L. ch. 90C, § 3(A)(4), as amended through St. 2009, c. 27, § 74, entitled "Issuance of citations; hearing; appeal; summons or warrant; complaint; trial; license or permit suspension," is a sui generis procedure for the adjudication of civil motor vehicle infractions ("CMVIs").  With respect to admissible prima facie evidence, it provides in pertinent part:  "In any such hearing before a magistrate or justice, the citation shall be admissible and shall be prima facie evidence of the facts stated therein."  Mass. Gen. L. ch. 90C, § 3(A)(4).

## STATEMENT OF FACTS

### Mr. Belezos's Citation for Violation of c. 90, § 18, Special Speed Regulation

15.     On September 28, 2011, a Hingham police officer issued Mr. Belezos a traffic citation for violation of a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18, i.e., operating a vehicle at a rate of speed in excess of a 30 m.p.h. Speed Limit sign posted on Gardner Street, Hingham, MA. (Exhibit No. 3, Massachusetts Uniform Citation issued to Nicholas Belezos).

   a. The 30 m.p.h. Speed Limit sign in question was "rectangular in shape, with black numerals on a white reflectorized background," i.e., a type "R2-1", which designates a special speed regulation.  (See Figure 1, infra).

   b. The 30 m.p.h. Speed Limit sign in question was posted on the portion of Gardner Street that lies north of Massachusetts Route 53, and which is commonly referred to as "upper" Gardner Street - a public roadway under the Town's jurisdiction.  (See Exhibit No. 8, infra, GPS maps, at 15).

   c. Mr. Belezos was not travelling inside an area identified as a "thickly settled or business district at a rate of speed exceeding thirty miles per hour for a distance of one-eighth of a mile" pursuant to Mass. Gen. L. ch. 90, § 17(3).

   d. The officer performed a traffic stop on the motor vehicle Mr. Belezos was operating, and then the officer delivered the citation in hand to the violator, Mr. Belezos.

16.     Mr. Belezos paid a $25 hearing fee to appear before a clerk-magistrate, and on December 28, 2011, a noncriminal hearing was held at Hingham District Court regarding the traffic citation (the "CMVI Hearing").

17.     Upon information and belief, the singular evidence of reasonable and proper speed proffered by a Hingham police officer at the CMVI Hearing was the prima facie evidence of the facts stated in the citation, i.e., the 30 m.p.h. Speed Limit sign designating a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18.  (See Mass. Gen. L. ch. 90C, § 3(A)(4), supra).

    a.   There was no proffer of any evidence that Mr. Belezos was travelling inside an area identified as a "thickly settled or business district at a rate of speed exceeding thirty miles per hour for a distance of one-eighth of a mile" pursuant to Mass. Gen. L. ch. 90, § 17(3).

    b.   There was no proffer of any evidence "having regard to traffic and the use of the way and the safety of the public" pursuant to Mass. Gen. L. ch. 90, § 17.

18.     At the conclusion of the hearing, the clerk-magistrate found Mr. Belezos responsible for a single traffic violation: "Violation Code: 90/18/A" / "Violation Description: Speeding in Viol Special Regulation * c90 §18", i.e., violation of a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18.  (See Exhibit No. 4, Judgment by Magistrate for Civil Motor Vehicle Infraction).

19.     In connection with this finding, the clerk-magistrate ordered judgment against Belezos in the amount of $100.  (Id.).

a.  The judgment amount included the statutory minimum $50 assessment for "violation of a special regulation made under the authority of section eighteen" pursuant to Mass. Gen. L. ch. 90, § 20.

b.  The remainder of the judgment amount comprised the mandatory $50 Head Injury Trust Fund Surcharge pursuant to Mass. Gen. L. ch. 90, § 20.

20.     On January 3, 2012, Mr. Belezos paid the $50 assessment and $50 Head Injury Trust Fund Surcharge in connection with the CMVI, in order to avoid the Registrar's threatened suspension of his license or right to operate all motor vehicles within the Commonwealth of Massachusetts, and the denial of his right to renew his registration.  (Exhibit No. 5, Belezos's $100 cancelled check payable to MassDOT).

21.     On January 24, 2012, a citation for "Speeding" was indicated on Mr. Belezos's Safe Driver Insurance Plan ("SDIP") Statement due to the December 28, 2011, judgment, thereby ending his two year, three months incident-free driving record and its eligibility towards an automobile insurance premium discount.  (Exhibit No. 6).

22.     Upon information and belief, Mr. Belezos was employed as a delivery truck driver immediately prior to the disposition of his Speeding citation.

23.     Upon information and belief, Mr. Belezos's SDIP Statement alerted his employer's commercial automobile insurance company to the Speeding incident, prompted the insurance company to exclude him from the commercial policy, and thereby cost Mr. Belezos his job position as a delivery truck driver.  (See Exhibit No. 7, Commercial Excess/Umbrella Liability Policy: Excluded Driver Endorsement).

**Gardner Street (upper) Speed Limit Signs (R2-1)**

24.    Upon information and belief, the Selectmen erected and maintain a total of two (2), 30 m.p.h. Speed Limit signs (R2-1) designating a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18, on Gardner Street (upper), Hingham, MA.  (Exhibit No. 8, "GPS Survey Posted Speed Limits Town of Hingham" (2012), "Gardner St. (upper)" GPS map at 15).  (See Figure 1, below).

 

Figure 1: Two (2), 30 m.p.h. Speed Limit signs (R2-1) on Gardner Street (upper)

25.    In a letter dated January 12, 2012, Mary-Joe Perry, District Highway Director, MassHwy, District 5 wrote Frederic P. Zotos, Esq.  that MassHwy searched the District's Records for any special speed regulation for Gardner Street, Hingham, MA, and they could find no evidence that one was ever issued.  (Exhibit No. 9).  She added that, "to post a numerical speed limit on a road a Special Speed Regulation is required." (Id.).

26.    Upon information and belief, the Selectmen had actual or constructive knowledge of the two (2), 30 m.p.h. Speed Limit signs (R2-1) on Gardner Street, Hingham, MA, and the fact that there is no approved special speed regulation pertaining thereto on file with MassDOT.

15

**Gardner Street (lower) Advisory Speed Plaques (W13-1P)**

27.     Upon information and belief, the Selectmen erected and maintain a total of seven (7), 25 m.p.h. Advisory Speed plaques (W13-1P) on the portion of Gardner Street that lies south of Massachusetts Route 53, and which is commonly referred to as "lower" Gardner Street.  (See Exhibit No. 8, supra, "Gardner St. (lower)" GPS map at 16).

    a.   Three (3) of these 25 m.p.h. Advisory Speed plaques supplement warning signs carrying the message "thickly settled," that are diamond in shape, with black letters on a yellow reflectorized background.  (See Figure 2, below).

  

Figure 2: Three (3), 25 m.p.h. Advisory Speed plaques (W13-1P), Gardner Street (lower)

    b.   Two (2) of these 25 m.p.h. Advisory Speed plaques are installed as separate sign installations, and do not supplement any warning signs. (See Figure 3, below).

 

Figure 3: Two (2), 25 m.p.h. Advisory Speed plaques (W13-1P), Gardner Street (lower)

**Speed Study of Gardner Street**

28.     Town of Hingham, Board of Selectmen, "Minutes of August 26, 2015 -
Traffic Committee Meeting," (Exhibit No. 10) note the following regarding a traffic
speed study on Gardner Street, a public roadway under the Town of Hingham's
jurisdiction:

> The Lower Gardner Street Association is requesting signs for speed enforcement
> as well as an extension of the sidewalk.  *There are currently 30 MPH speed signs*
> *but there is no record of them.*  Most residential neighborhoods have a speed limit
> of 30 MPH as it is and this neighborhood is thickly settled as well.  Sgt. Horte
> [Hingham Police Department] conducted a speed study and found the average
> speed travelled is 37 MPH which is not excessive.  *The signs which are currently*
> *posted are not permitted but are still enforceable.*  The question is whether they
> are challenged in court, if it would they would be found to be illegal and the
> Town might be sued.  Sgt. Horte has contacted Town Counsel about this and will
> be speaking with them this week.

 (Id.) (emphasis added) (comments added in brackets).

29.     Upon information and belief, the 85th percentile speed of motor vehicles
travelling along Gardner Street, Hingham, MA, is greater than 40 m.p.h., which is also
greater than the 30 m.p.h. Speed Limit signs (R2-1) posted on Gardner Street (upper) and
the 25 m.p.h. Advisory Speed plaques (W13-1P) posted on Gardner Street (lower).

**Selectmen's Erection and Maintenance of Speed Limit Signs (R2-1)**

30.     Upon information and belief, there are at least twenty-six (26) Speed Limit
signs (R2-1) posted on the public roadways under the sole jurisdiction of the Town of
Hingham, and without having approved special speed regulations on file with MassDOT.
(See Exhibit No. 8, supra, Table 3, at 5-6; GPS maps, at 10-24).

a. All of these Speed Limit signs "are rectangular in shape, with black numerals on a white reflectorized background" (R2-1) designating a special speed regulation lawfully made under the authority of Mass. Gen L. ch. 90, § 18.  (Id.).

b. These Speed Limit signs (R2-1) are located on at least eight (8) roadways (i.e., Cushing, Fort Hill, Free, Gardner (upper), Longmeadow, Prospect, Shipyard, and Tuckers).  (Id.).

c. Of these Speed Limit signs (R2-1), fifteen (15) are 30 m.p.h., nine (9) are 20 m.p.h. (and are not "within a school zone which may be established by a city or town as provided in section 2 of chapter 85," pursuant to Mass. Gen. L. ch. 90, § 17(4)), and two (2) are 15 m.p.h.  (See, e.g., Figure 4, below).

  

Figure 4: 30 m.p.h., 20 m.p.h., and 15 m.p.h. Speed Limit signs (R2-1) in Hingham, MA

31.     Town of Hingham, Board of Selectmen, "Minutes of May 26, 2010 - Traffic Committee Meeting," (Exhibit No. 11) note the following regarding the erection of two (2), 20 m.p.h. Speed Limit signs on Bare Cove Park Drive, Hingham, MA:

Patricia Coyle, Treasurer of Bare Cove Park Committee, revisited the issue of speed limit signs being installed on Bare Cove Park Drive.  This request was

originally made last May.  At that time, the Committee suggested that the matter be revisited this spring after the Carlson Field had been in operation. It was noted that traffic has increased on the road due to field users as well as by people going to Bare Cove Park.  *As a result of these dynamics, the Committee unanimously agreed to recommend the installation of two 20 MPH speed limit signs to be located near the field.  It should be noted that these speed signs cannot be enforced by Hingham Police Department.  Harry Sylvester [Hingham DPW] stated that he would have the signs placed promptly.*

 (Id.) (emphasis added) (comments added in brackets).

32.     On December 30, 2014, upon information and belief, a Hingham police officer issued Mr. Liam Richmond a citation for operating a motor vehicle at a rate of speed in excess of a 25 m.p.h. posted speed limit on Bare Cove Park Drive, Hingham, MA.

### Selectmen's Enforcement of Speed Limit Signs (R2-1)

33.     Upon information and belief, the Hingham Police Department issued a total of at least 2,695 traffic citations during the period starting from September 28, 2011, and ending January 28, 2018.

    a.  Of these 2,695 traffic citations, 1,247 (approximately 46.3%) were issued on public roadways under the sole jurisdiction of the Town, and without having approved special speed regulations on file with MassDOT.

    b.  Of these 1,247 traffic citations, 823 (approximately 2/3rd's) were issued for violations of Mass. Gen. L. ch. 90, § 17, i.e., operating a motor vehicle at a rate of speed greater than is reasonable and proper.  Of these 823 traffic citations:

       i.   111 (approximately 9%) were issued on Beal Street;

       ii.   87 (approximately 7%) were issued on Cushing Street;

       iii.   30 (approximately 2.4%) were issued on Fort Hill Street; and,

       iv.   28 (approximately 2.2%) were issued on Gardner Street.

c. Of these 1,247 traffic citations, the remaining balance of 384 (approximately 1/3rd) were issued for violations of a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18, i.e., operating a vehicle a rate of speed in excess of a posted Speed Limit sign (R2-1). Of these 384 traffic citations:

       i.   22 (approximately 5.7%) were issued on Beal Street;

       ii.   159 (approximately 41.4%) were issued on Cushing Street;

       iii.   86 (approximately 22.4%) were issued on Fort Hill Street; and,

       iv.   14 (approximately 3.6%) were issued on Gardner Street.

d. Of these 384 traffic citations, 13 (approximately 3.4%) involved motor vehicle stops which resulted in either criminal applications (e.g., operating under the influence, operating with a suspended or revoked license, etc.), or arrests, or both of these.

**<u>Selectmen's Erection and Maintenance of Advisory Speed Plaques (W13-1P)</u>**

34.     Upon information and belief, there are at least thirty-four (34) Advisory Speed plaques (W13-1P) posted on the public roadways under the sole jurisdiction of the Town of Hingham.  (Exhibit No. 8, supra, GPS maps, at 8-26).

  a.   All of these Advisory Speed plaques are rectangular in shape, with black letters on a yellow reflectorized designating an Advisory Speed (W13-1P) duly established in accordance with the provisions of Mass. Gen. L. ch. 85, § 2, the "2009 Manual on Uniform Traffic Control Devices," and "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices."  (Id.).

  b.   These Advisory Speed plaques (W13-1P) are located on at least twelve (12) public roadways (i.e., Bare Cove Park, Beal, Fort Hill, French, Gardner (lower), Grenadier, Martins, North, Ship, Spring, Water, and West).  (Id.).

  c.   Eight (8) of these Advisory Speed plaques (W13-1P) supplement warning signs carrying the message "thickly settled," that are diamond in shape, with black letters on a yellow reflectorized background.  (Id.).

    i.   Four (4) of these are 30 m.p.h. plaques.  (See, e.g., Figure 7, infra).

    ii.   Four (4) of these are 25 m.p.h. plaques.  (See, e.g., Figure 2, supra, 25 m.p.h. Advisory Speed plaques on Gardner Street (lower)).

    d.  Sixteen (16) of these Advisory Speed plaques (W13-1P) are installed as separate sign installations.  (See, e.g., Figure 5, below).

        iii.  Two (2) of these are 25 m.p.h. plaques.

        iv.  Ten (10) of these are 20 m.p.h. plaques (not within a school zone).

        v.  Four (4) of these are 15 m.p.h. plaques.

 

Figure 5: 25 m.p.h., 20 m.p.h., and 15 m.p.h. Advisory Speed plaques (W13-1P) installed as separate sign installations in Hingham, MA

35.  Town of Hingham, Board of Selectmen, "Minutes of May 28, 2014 - Traffic Committee Meeting," (Exhibit No. 12) note the following regarding a traffic speed study on Conservatory Park, Hingham, MA, and the installation of  four (4), 15 m.p.h. Advisory Speed plaques:

> Sgt. Horte [Hingham Police Department] presented the results of the *Conservatory Park speed study* which was conducted by Sgt. Steven Dearth [Hingham Police Department].  Two studies were conducted: ...  *Both were within the 85th percentile as measured by Mass Highway which means that they are within the proper parameters and that speed is not excessive*.  Gia Ramza of Franklin Rogers Road said that their intention was not to control speed on the road as *the speed limit is 30 MPH*. ...
>
> *The suggested solution was to install suggested speed signs (yellow signs) which are not enforceable.  This is not common knowledge, however so this would be helpful.*  The residents in attendance were very happy with this suggestion.  Signs will be installed at Charles Everett, Dwiggins Path and Franklin Rogers at John Hazlitt and Isaac Sprague.  *There will be four 15 MPH suggested speed signs*

*installed* as motioned by Sgt. Horte, seconded by Dan Zivkovich and unanimously voted.

(Id.) (emphasis added) (comments added in brackets).

## Selectmen's Enforcement of Advisory Speed Plaques

36.     Upon information and belief, the Selectmen issue traffic citations for operating a vehicle a rate of speed in excess of Advisory Speed plaques (W13-1P), which do not coincide with the prima facie rates of speed pursuant to Mass. Gen. L. ch. 90, § 17(1) - (4).  For example:

i.     On January 22, 2012, a Hingham police officer issued Ms. Tori Glover a citation for operating a vehicle at a rate of speed in excess of a 25 m.p.h. posted speed limit on North Street (See, e.g., Exhibit No. 8, supra, "North St." GPS map at 19);

ii.     On June 1, 2012, a Hingham police officer issued Ms. Cynthia Castro a citation for operating a vehicle at a rate of speed in excess of a 35 m.p.h. posted speed limit on Water Street (See Id., e.g., "Water St." GPS map at 25);

iii.     On March 7, 2014, a Hingham police officer issued Mr. Patrick Jenkins a citation for operating a vehicle at a rate of speed in excess of a 25 m.p.h. posted speed limit on Gardner Street (See Id., e.g., "Gardner St. (lower)" GPS map at 14);

iv.     On October 17, 2014, a Hingham police officer issued Ms. Marijane Deitsch a citation for operating a vehicle at a rate of speed in excess of a

23

20 m.p.h. posted speed limit on Beal Street (See Id., e.g., "Beal St." GPS map at 9).  Ms. Deitsch was not travelling "within a school zone which may be established by a city or town as provided in section 2 of chapter 85" pursuant to Mass. Gen. L. ch. 90, § 17(4); and,

v.   On May 25, 2016, a Hingham police officer issued Ms. Kimberly Barrow a citation for operating a vehicle at a rate of speed in excess of a 15 m.p.h. posted speed limit on North Street (See Id., e.g., "North St." GPS map at 19).

**Speed Limit Signs (White) vs "Thickly Settled" & Advisory Speed Plaques (Yellow)**

37.   Town of Hingham, Board of Selectmen, "Minutes of January 25, 2012 - Traffic Committee Meeting," (Exhibit No. 13) note the following regarding a request for a speed sign on South Street, Hingham, MA:

South Street residents in attendance presented a petition signed by 44 residents of South Street and South Lane requesting that signs be posted on both sides of the South Street.  *They would like to have a yellow speed limit sign for 20 MPH*  ... [discussion ensued] ... Paul Healey (Planning Board) noted that sometimes data is revealed to be different than the perception.  *As for speed signs, the white signs need to be approved by the State after studies, etc.  A "Thickly Settled" sign might work better.* ... [discussion continued] ...

... Sgt. Dearth [Police Department] made a motion to conduct the speed study and report his findings in May.  Jay Costello seconded the motion.

 (Id.) (emphasis added) (comments added in brackets).

38.     Town of Hingham, Board of Selectmen, "Minutes of September 26, 2012 - Traffic Committee Meeting," (Exhibit No. 14) note the following regarding the results of a traffic speed study on South Street, Hingham, MA:

> Sgt. Dearth [Police Department] presented the committee with the results of the Speed Study which took place during the period of 5/27/12-6/2/12.  Based upon the data that was reviewed, the crash rates in the area were insignificant.  ...
>
> ...  The data collected showed that 85% of the traffic was travelling 37 MPH which is very close to the speed limit.   Sgt. Dearth stated that this was encouraging and shows that cars are not going in excess of the speed limit. _Tickets and warnings are issued at the officers' discretion but normally are given in cases when the operator is going 10-15 MPH over the speed limit._  95% of cars were going 39 MPH which is still not a dangerous rate. ...  [discussion ensued]
>
> ... Harry Sylvester [DPW] said that if the results of the speed study were submitted to Mass. DOT (Department of Transportation), the posted speed limit on the street would be increased to 35 MPH.  Dan Zivkovich agreed as it is based on average speed taken from the speed study.   _If yellow signs are posted (suggested speed limits), they are not enforceable._  The State defines 30 MPH as areas with houses less than 200 feet apart.
>
> _Sgt. Dearth recommends that a yellow and black "Thickly Settled" sign be installed as an advisory sign (which means 30 MPH)_ on the straightaway near SSCC and prior to Forget Me Not Lane.  ... [discussion ensued] ... Sgt. Dearth recommends "Thickly Settled" signs due to volume and revisit the issue in 6 months.  Harry Sylvester stated the crash data was insignificant and that the speed study showed that only 5% of drivers exceeded the speed limit.  There is no need to add signs- they cost money, are a maintenance problem, are a drain on the budget and people do not pay attention to signs.

 (Id.) (emphasis added) (comments added in brackets).

39.     Town of Hingham, Board of Selectmen, "Minutes of February 24, 2016 - Traffic Committee Meeting," (Exhibit No. 15) note the following regarding suggested speed signs  on High Street, Hingham, MA:

> Lt. Haley (Fire) also suggested moving the _20 MPH suggested speed sign_ to that area to see if that helps to deter people from speeding. Harry Sylvester [DPW]

reminded everyone that *this sign is a suggested speed sign only and cannot be enforced.  These signs are yellow and the regular speed signs are white.  Those are the ones that can be enforced.*  All thickly settled areas of the Town are 30 MPH.

(Id.) (emphasis added) (comments added in brackets).

### MassDOT Notice re: "Installation of Regulatory Signs And Speed Limit Signs"

40.     In a letter dated August 24, 2012, Neil Boudreau, State Traffic Engineer, MassDOT, wrote to the Board of Selectmen, Town of Hingham, regarding the "Installation of Regulatory Signs And Speed Limit Signs."  (Exhibit No. 16).

    a.  In this letter, MassDOT gave "MGL c.85, Section 2 Notice to the Town of Hingham regarding the special speed regulations listed as improperly installed."  (Id. at 3, citing Table 3, "Photographic GPS Survey of Posted Speed Limits, Town of Hingham, MA" (2012)) (See Exhibit No. 8, supra Table 3, at 5-6).

    b.  With respect to approved special speed regulations on ways in the Town, the letter provides in pertinent part:

Consistent with the statutory duty under MGL c.85, Section 2 and MGL. C 90, Section 18, the Massachusetts Department of Transportation has reviewed its files and determined that its files contain Special Speed Regulations for the following town ways in the Town of Hingham and have been approved by the Department of Transportation and the Registrar of Motor Vehicles, as required by MGL c. 90, Section 18:

    i.  Main Street, East Street, Hull Street (Route 228) – Special Speed Regulation 824, 824-A, 824-B, and 824-c, dated August 22, 1973, November 5, 1923, October 6, 1976 and August 12, 2008, respectively.

    ii.  Charles Street and Lazell Street – Special Speed Regulation 7440, dated August 26, 1988.

(Exhibit No. 16, supra, at 2-3).

      c.   MassDOT reminded the Town of its Speed Zoning Procedures, and offered its assistance by providing guidance on policies and procedures:

> The Massachusetts Department of Transportation, never the less, would remind the Board of Selectmen that the primary objective of MGL. c.85, Section 2, MGL. c.90, Section 18 and MassDOT's Speed Zoning Procedures (a copy is attached) [See Exhibit 1, supra] is to provide safe and appropriate speed limits on all paved streets and highways in the Commonwealth of Massachusetts with full recognition of the general motoring public's right to use a roadway in a demonstrably reasonable and proper manner. An ideal speed limit posting is one that is readily acceptable to prudent drivers and subsequently becomes self-enforcing. If the Town of Hingham wishes to establish speed limits in accordance with the aforementioned statutes on any way under its custody and control, the Massachusetts Department of Transportation Highway Division District Five Office would be more than willing to assist the Town of Hingham by providing guidance on policies and procedures.

(Id. at 3-4) (comments added in brackets).

### Traffic and Engineering Studies

41.    With respect to establishing Speed Limits, the "Procedures for Speed Zoning on State and Municipal Roads" regulatory standards provide in pertinent part:

> _Speed limits shall be established only after an engineering and traffic investigation_ has been conducted in compliance with established traffic engineering practices. The ideal speed limit is both acceptable to the prudent driver and enforceable by our police departments.

(emphasis added) (Exhibit No. 1, supra, at 2).

> _A prerequisite to establishing speed regulations and posting speed limits is a comprehensive engineering study_ at each location where speed control is contemplated. The purpose of the study is to establish a speed limit that is safe, reasonable and self-enforcing. The most important step is measuring the prevailing speeds of motorists on a particular section of a roadway under ideal conditions. The speed at or below which 85 percent of the motorists travel is the principle value used for establishing speed control. This is commonly referred to

as the **85 percentile speed**.  This method is based on numerous studies which indicate that the majority of motorists are prudent and capable of selecting safe speeds.  The 85th percentile speed is the national standard for establishing safe speed limits.

Id. at 4 (emphasis added).

The **85th percentile speed** of vehicles passing a given point is the speed at or below which 85 percent of the vehicles passing the point are traveling. This is the principle value used for establishing speed controls. This method assumes that the majority of motorists are prudent and capable of selecting safe speeds; therefore, *speeds established in this manner meet the legal requirement that they be "reasonable and proper."*

Id. at 12 (emphasis added).

Posted limits are rounded off to the nearest 5 mile per hour increment.

Id. at 13.

Successful speed zoning is a cooperative project which includes the traffic engineer, the enforcement agencies and the judiciary. It requires careful engineering, conformance to recognized standards, state-wide uniformity, and development of public understanding and support. Under this approach, speed zoning is a valuable aid to the conscientious motorist and to enforcement officials.

Id. at 23.

## Road Safety Audit of Cushing Street

42.     On June 22, 2011, MassDOT conducted a Road Safety Audit ("RSA") of Cushing Street, Hingham, MA.  (Exhibit No. 17).

a.   The audit described the Cushing Street location, and notes in pertinent part:

Project Location Description: ... Cushing Street is a rural minor collector and falls under Town jurisdiction. ... *The speed limit along Cushing Street is posted 30 miles per hour (mph) in both directions.  There is no speed regulation on file.*

(Id. at 3) (emphasis added).

b.   The audit observed vehicle travel speeds, and notes in pertinent part:

Observations: RSA team members noted that *vehicle travel speeds appear to be faster than the posted 30 mph regulation*.  *The Hingham Police Department noted that they routinely write tickets along the Cushing Street corridor.*

(Id. at 10) (emphasis added).

c.   The audit recommended enhancements, and notes in pertinent part:

Enhancements:  []  *Conduct a speed survey in the vicinity*.  If appropriate, *submit the speed study to MassDOT requesting a posted regulatory speed* along Cushing Street.

(Id.) (emphasis added).

43.   Town of Hingham, Board of Selectmen, "Minutes of March 28, 2012 - Traffic Committee Meeting," (Exhibit No. 18) note the following regarding a traffic speed study on Cushing Street, Hingham, MA:

I.  Cushing Street Speed Study – Sergeant Dearth [Hingham Police Department] presented the Speed Study that was conducted by the Massachusetts Department of Transportation at the request of the Hingham Police Department as part of the Road Safety Audit which concentrated on the 400 block of Cushing Street.  The study was done over a 7 day period and showed that the average speed travelling both northbound and southbound was 38 mph.  The majority of the cars (82%) were travelling at a pace speed of between 34-43 mph.  Sergeant Dearth noted that the *speed was lower than he would have predicted and indicates that speed isn't a factor on Cushing Street*.  *Another reason is that enforcement is consistent on the street and tickets are issued on a regular basis which is a deterrent. Sergeant Dearth advised against contacting the State to adjust the speed on the street as the posted speed limit [30 mph] would most likely be posted higher 40 (mph) which is not the desired outcome*.

(Id.) (emphasis added) (comment added in brackets).

44.   Upon information and belief, the Selectmen erected and maintain at least five (5), 30 m.p.h. Speed Limit signs that "are rectangular in shape, with black numerals on a white reflectorized background" (R2-1) designating a special speed regulation

lawfully made under the authority of Mass. Gen L. ch. 90, § 18, on Cushing St., Hingham, MA.  (See Figure 6 below).

  

 

Figure 6: Five (5), 30 m.p.h. Speed Limit signs (R2-1) on Cushing Street

    a.  None of these Speed Limit signs (R2-1) have approved special speed regulations on file with MassDOT.

### Traffic Study of Beal Street/West Street/Fort Hill Street

45.    The "Beal Street/West Street/Fort Hill Street Corridor Study," published July 2006, was commissioned by the Town of Hingham as a comprehensive study of traffic conditions on these three public roadways under the Town's jurisdiction.  (Exhibit No. 19).

    a.  The study tabulates the results of vehicle travel speed measurements performed on Beal Street and Fort Hill Street, and notes in pertinent part:

... the mean (average) vehicle travel speed along Beal Street, north of West Street, was found to be approximately 42 miles per hour (mph).  _The average measured 85th percentile vehicle travel speed_, or the speed at which 85 percent of the

observed vehicles traveled at or below, *was found to be approximately 48 mph, or 18 mph above the posted speed limit of 30 mph*.  The mean vehicle travel speed along Fort Hill Street, south of New Bridge Street was found to be approximately 37 miles per hour (mph).  *The average measured 85th percentile vehicle travel speed*, or the speed at which 85 percent of the observed vehicles traveled at or below, *was found to be approximately 44 mph, or 14 mph above the posted speed limit of 30 mph*.  The 85th percentile speed is used as the basis of engineering design and in the evaluation of sight distances, and is often used in establishing posted speed limits.

(Id. at 8) (emphasis added).

> b.  The study tabulates the results of motor vehicle crash trends occurring within the study area, and notes in pertinent part:

... the study area intersections averaged approximately 3 or fewer reported motor vehicle crashes per year over the three-year review period and were found to have a *motor vehicle crash rate below the MassHighway average* for unsignalized intersections for the MassHighway District in which the Town of Hingham is located (District 5).

(Id. at 8-9) (emphasis added).

46.  Upon information and belief, the Selectmen erected and maintain at least nine (9) Advisory Speed plaques that are rectangular in shape, with black letters on a yellow reflectorized background (W13-1P) designating Advisory Speeds on Beal Street, Hingham, MA.  (See Exhibit No. 8, supra, "Beal St." GPS map at 9).

> a.  Two (2) of these are 30 m.p.h. Advisory Speed plaques (W13-1P) supplement warning signs carrying the message "thickly settled," that are diamond in shape, with black letters on a yellow reflectorized background. (See, Figure 7 below).



Figure 7: Two (2), 30 m.p.h. Advisory Speed plaques (W13-1P) on Beal Street

  b.  Seven (7) of these are 20 m.p.h. Advisory Speed plaques (W13-1P) are
      installed as a separate sign installation.  (See, e.g., Figure 5, supra).

47.    Upon information and belief, the Selectmen erected and maintain at least
four (4), 30 m.p.h. Speed Limit signs that "are rectangular in shape, with black numerals
on a white reflectorized background" (R2-1) designating a special speed regulation
lawfully made under the authority of Mass. Gen L. ch. 90, § 18, on Fort Hill Street,
Hingham, MA.  (See Figure 8 below).





Figure 8: Four (4), 30 m.p.h. Speed Limit signs (R2-1) on Fort Hill Street

32

a. None of these Speed Limit signs (R2-1) have approved special speed regulations on file with MassDOT.

### Effects of Speed Zoning

48. With respect to the effect of speed zoning, the "Procedures for Speed Zoning on State and Municipal Roads" provides in pertinent part:

> Studies have shown that speed zoning has very little permanent effect on average vehicular speeds.  There are indications, however, that it does have a tendency to group more of the drivers within the Pace since some of the slower drivers speed up and some of the faster drivers slow down after the speed limits are posted.

(Exhibit No. 1, supra, at 23).

49. Federal Highway Administration research confirms MassHwy's observations regarding the "very little permanent effect" of posted speed limits on average vehicular speeds: "State or local officials often receive citizen requests for speed limit reductions because of perceived excessive speeds.  However, research has repeatedly shown that changes in posted speeds have little effect on operating speeds." Parker, M.R., "Synthesis of Speed Zoning Practices," Report No. FHWA/RD-85/096 (1985).

50. On August 10, 2011, the Patriot Ledger newspaper published an article entitled "Police: Tailgating is the leading cause of injury accidents in Hingham." (Exhibit No. 20).  The article reported in pertinent part:

> A recent review of Hingham traffic data from 2010 showed that tailgating was the most common cause of crashes involving injuries in town.  It sent more people to the hospital than even speeding or drunken driving.
>
> Sgt. Steven Dearth, head of Hingham's traffic division, dug into the data recently so he could educate patrol officers on the most common causes of serious

accidents.   He expected that tailgating – called "following too close" in police parlance – would register, but he didn't expect it to top the list.

"I was surprised it was No. 1," he said.

Eight hundred and fifty-one crashes were reported in Hingham last year, including 93 that resulted in one or more injuries.  Of those accidents, Dearth found that 30 were caused by tailgating, while 23 were blamed on drivers who crossed into another marked lane or went off the road) and 10 occurred when a driver failed to stop for a stop sign.

Speeding accounted for six crashes and drunken driving was blamed for another four, while the rest were attributed to failure to yield and a variety of other violations.

(Id.).

## Existence of an Actual Case or Controversy Between the Parties

51.     There is an actual case or controversy between Mr. Belezos and all others similarly situated on the one hand, and the Selectmen and all others similarly situated on the other hand regarding the illegality and unconstitutionality of the Selectmen's executive actions, statutes, Speed Limit signs (R2-1), and Advisory Speed plaques (W13-1P) generally applicable to Mr. Belezos.

52.     A real dispute exists, and Mr. Belezos has a sufficient personal interest in the rights and relief at stake to meet standing requirements.

53.     There is no indication that the Selectmen will either remove Speed Limit signs (R2-1) which are unauthorized by special speed regulations and do not conform to MassDOT regulatory standards, or refrain from enforcing them.

54.     There is no indication that the Selectmen will either remove Advisory Speed plaques (W13-1P) which do not conform to MassDOT regulatory standards, or refrain from enforcing them.

55.     There exists a continuing threat, indeed a likelihood, of continued prosecution for operating a motor vehicle at a rate of speed in excess of either unauthorized Speed Limit signs (R2-1), or nonconforming Advisory Speed plaques (W13-1P).

56.     Further, judicial efficiency would not be promoted by declining to act on this case, only to face the same issue again.

57.     This controversy can be resolved and uncertainty removed by declaratory judgment.

## **CLASS ACTION ALLEGATIONS**

58.     Mr. Belezos brings this action on his own behalf and as a class action on the behalf of all other similarly situated persons, pursuant to Fed. R. Civ. P. 23(a) and (b) on behalf of a Plaintiff Class defined as:

> Any person who received motor vehicle traffic citations for violation of a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18, i.e., operating a vehicle at a rate of speed in excess of a Speed Limit sign (R2-1), where (in fact) there is no such approved special speed regulation, and who, by reason thereof, suffered or experienced an adverse legal consequence, including payment of an assessment, surcharge, cost or fee in disposition of the citation, or whose admission or finding of responsibility have been or may be counted against them in the future for the purposes of adversely affecting their driving record or automobile insurance premium, or all these things, from September 28, 2011, to the date of the judgment in this action.

59.     Excluded from the Plaintiff Class are the Selectmen and members of the Defendant Class, Plaintiff's counsel, the judges to whom this case is assigned, and any family members thereof.  Mr. Belezos reserves the right to modify or amend the Plaintiff Class definition as appropriate.

60.     Mr. Belezos brings this action on his own behalf and as a class action on the behalf of all other similarly situated persons, pursuant to Fed. R. Civ. P. 23(a) and (b) against a Defendant Class defined as:

> The board of selectmen, the city council, the transportation commission of the city of Boston, park commissioners, a traffic commission or traffic director, or the secretary of the Department of Transportation or Executive Office of Public Safety of the Commonwealth of Massachusetts, or any public official or employee of all agencies, counties, cities, towns or other political subdivisions of the Commonwealth of Massachusetts, who erected or maintained Speed Limit signs (R2-1) designating a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18, where (in fact) there is no such approved special speed regulation, or who enforced these Speed Limit signs (R2-1) by issuing motor vehicle citations for operating a vehicle at a rate of speed in excess of such a Speed Limit sign, or who, by reason thereof, enjoyed or experienced a favorable legal consequence, including receipt of assessments, surcharges, costs or fees in disposition of the citations, or all these things, from September 28, 2011, to the date of the judgment in this action.

61.     Certification of the Plaintiff's claims for class-wide treatment is appropriate because Mr. Belezos can prove elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

62.     Numerosity – Fed. R. Civ. P. 23(a)(1).  The Class is so numerous that individual joinder of all Class members is impracticable.  Mr. Belezos is informed and

36

believes that there are hundreds of Plaintiff Class members, and scores of Defendant Class members.  The precise number of Class members and their addresses are unknown to Mr. Belezos, but may be ascertained from MassDOT, Registry of Motor Vehicles (hereinafter "RMV"), highway and police department records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, published notice, or all of these things.

63.     Commonality and Predominance – Fed. R. Civ. P. 23(a)(2) and 23(b). This action involves questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class members.  All Plaintiff Class members were subject to the Defendant Class members same traffic enforcement of Speed Limit signs (R2-1) by issuance of traffic citations.  Defendant Class members have acted and refused to act on grounds of illegal and unconstitutional executive actions, statutes and Speed Limit signs (R2-1) generally applicable to the Plaintiff Class so that final declaratory or injunctive relief would be appropriate to the Plaintiff Class as a whole.  Furthermore, common questions of law and fact include, but are not limited to:

     a. Whether Defendants' conduct of erecting, maintaining and enforcing Speed Limit signs (R2-1) as alleged herein violates Mass. Gen. L. ch. 90, § 18 (and set forth in Mass. Gen. L. ch. 85, § 2), the "Procedures for Speed Zoning on State and Municipal Roads", and "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices";

     b. Whether Defendants' conduct of erecting, maintaining and enforcing Advisory Speed plaques (W13-1P) as alleged herein violates the "Procedures for Speed Zoning on State and Municipal Roads" (as authorized by Mass. Gen. L. ch. 90, § 18 and set forth in Mass. Gen. L. ch. 85, § 2);

    c.   Whether Defendants' conduct of fabricating false prima facie evidence of Speed Limit signs and traffic citations as alleged herein deprives Plaintiffs of their property and liberty without due process of law; and,

    d.   Whether the lack of any evidentiary proof requirement under Mass. Gen. L. ch. 90C, § 3(A)(4) or Mass. Gen. L. ch. 90, § 17, or both of these, pertaining to whether a Speed Limit sign (R2-1) has been duly established upon any way in accordance with the provisions of Mass. Gen. L. ch. 90, § 18 (i.e., a special speed regulation), deprives Plaintiffs of their property and liberty without due process of law.

64.    Typicality – Fed. R. Civ. P. 23(a)(3).  Mr. Belezos's claims are typical of the claims of the other members of the Plaintiff Class because, among other things, all Plaintiff Class members were similarly injured through the uniform misconduct of Defendant Class members described herein.  Namely, all Plaintiff Class members have the same claims, i.e., that Defendants' illegal and unconstitutional executive actions, statutes and Speed Limit signs (R2-1) deprived them of their property and liberty without due process of law, and that the Defendant Class members acted ultra vires.  Moreover, Defendant Class members are juridically linked through their common relationship as public officials to the Commonwealth of Massachusetts.  This information is sufficient to support a determination that both Mr. Belezos and the Selectmen satisfy the typicality requirement.

65.    Adequacy of Representation – Fed. R. Civ. P. 23(a)(4).  Mr. Belezos is an adequate Class representative because his interests do not conflict with the interests of the other members of the Class he seeks to represent; he has retained counsel competent and experienced in complex litigation, and the specific claims herein; and Mr. Belezos intends to prosecute this action vigorously.  The Plaintiff Class members' interests will be fairly and adequately protected by Mr. Belezos and his counsel.  Likewise, the Selectmen

are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; and they have every incentive to defend this action vigorously. Defendant Class members' interests will be fairly and adequately protected by the Board of Selectmen of the Town of Hingham.

66.     Superiority - Fed. R. Civ. P. 23(b).   A class action is superior to any other available methods for fairly and efficiently adjudicating this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.   The damages or other financial detriment suffered by Mr. Belezos and other members of the Plaintiff Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against the members of the Defendant Class, the pursuit of which occasionally can prove recondite.   For instance, both the law of Constitutional due process and remedies against government officials are vast and complex bodies of doctrine, full of technical distinctions, fictional explanations, and contested compromises.   So it would be therefore impracticable for the Plaintiff Class members to individually seek redress for Defendants' wrongful conduct.   Even if the Plaintiff Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.   By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.   Moreover, the juridical link that exists between the Defendant Class members is a legal relationship which unites them in a way that makes a single lawsuit more efficient than separate suits against individual defendants.

## CLAIMS FOR RELIEF

(Mr. Belezos and the members of the Plaintiff Class against the Selectmen in their

official capacity and the members of the Defendant Class in their official capacity)

## COUNT I

(Massachusetts Statutory Violation)

Mass. Gen. L. ch. 90, § 18 (and set forth in Mass. Gen. L. ch. 85, § 2)

67.    Mr. Belezos repeats, re-alleges and incorporates by reference the above

allegations as if hereinafter set forth in full.

68.    Selectmen's, erection, maintenance and enforcement of speed control

signs, a/k/a/ Speed Limit signs (R2-1), designating a special speed regulation purporting

to be lawfully made under the authority of Mass. Gen. L. ch. 90, § 18, without: (1)

MassDOT and the Registrar, acting jointly, certifying in writing that such regulation is

consistent with the public interests, and (2) erecting upon the ways affected thereby and

at such points as MassDOT and the Registrar, acting jointly, may designate, signs,

conforming to standards adopted by MassDOT, setting forth the speed established by the

regulation, violates the provisions of  Mass. Gen. L. ch. 90, § 18 (and set forth in Mass.

Gen. L. ch. 85, § 2).

69.    Selectmen's , erection, maintenance and enforcement of Speed Limit signs

(R2-1) in violation of Mass. Gen. L. ch. 90, § 18 (and set forth in Mass. Gen. L. ch. 85, §

2), exceeds the authority granted to them by the Commonwealth of Massachusetts, is

ultra vires and void, and therefore these Speed Limit (R2-1) signs are illegal and

unenforceable.

40

## COUNT II

(Massachusetts Regulatory Standards Violation)

"Procedures for Speed Zoning on State and Municipal Roads" (as authorized by Mass.

Gen. L. ch. 90, § 18 and set forth in Mass. Gen. L. ch. 85, § 2)

70.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

71.     Selectmen's erection, maintenance and enforcement of Speed Limit signs (R2-1), designating a special speed regulation purporting to be lawfully made under the authority of Mass. Gen. L. ch. 90, § 18, without: (1) completing a thorough traffic engineering study, (2) drafting a special speed regulation, and (3) approval by the governing authority, the Registrar and MassHwy, violates the provisions of the "Procedures for Speed Zoning on State and Municipal Roads" regulatory standards.

72.     Selectmen's erection, maintenance and enforcement of Advisory Speed plaques (W13-1P) designating advisory speeds purporting to be lawfully made in accordance with MassDOT's current manual on uniform traffic devices, without: either (1) determining the advisory speed by an engineering study that follows established engineering practices, or (2) being used to supplement a warning sign to indicate the advisory speed for that condition (i.e., installing the Advisory Speed plaque as a separate sign installation), or both of these, violates the provisions of the "Procedures for Speed Zoning on State and Municipal Roads" regulatory standards (M.U.T.C.D. § 2C.08).

73.     Selectmen's erection, maintenance and enforcement of Speed Limit signs (R2-1) and Advisory Speed plaques (W13-1P) that are below the five (5) m.p.h.

41

increment nearest to the 85th percentile speed (justified by a traffic engineering speed study), violates the provisions of the "Procedures for Speed Zoning on State and Municipal Roads" regulatory standards.

74.     Selectmen's erection, maintenance and enforcement of Speed Limit signs (R2-1) and Advisory Speed plaques (W13-1P) in violation of the "Procedures for Speed Zoning on State and Municipal Roads" regulatory standards, exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore these Speed Limit (R2-1) signs and Advisory Speed plaques (W13-1P) are illegal and unenforceable.

## COUNT III

(Massachusetts Regulatory Standards Violation)

"The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices" (as authorized by Mass. Gen. L. ch. 85, § 2)

75.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

76.     Selectmen's erection, maintenance and enforcement of Speed Limit signs (R2-1) designating a special speed regulation purporting to be lawfully made under the authority of Mass. Gen. L. ch. 90, § 18, without: (1) conducting proper studies and submitting data of the proposed speed zones to MassDOT, (2) conducting all hearings required for adoption drafting a special speed regulation, (3) notifying MassDOT of formal adoption by the municipality, (4) approval by MassDOT and the Registry, (5)

installing official speed limit signs accordance with the specific provisions of the approved regulation, and only then (6) enforcing against violators, violates the provisions of "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 regulatory standards.

77.    Selectmen's erection, maintenance and enforcement of Speed Limit signs (R2-1) in violation of the "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 regulatory standards, exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore these Speed Limit (R2-1) signs are illegal and unenforceable.

## COUNT IV

Deliberate and Reckless Fabrication of False Evidence

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the United States Constitution as secured by 42 U.S.C. § 1983)

78.    Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

79.    Upon information and belief, it is the policy, custom, or practice, or all of these, of the Selectmen, to knowingly, recklessly, or with deliberate indifference and callous disregard of the applicable statutes, regulatory standards and Mr. Belezos's rights, either erect and maintain, cause to be erected and maintained, or fail to remove or cause to be removed, Speed Limit signs (R2-1) that purport to set forth a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18.  Said signs in

fact falsely represent a special speed regulation where none exists, are unauthorized by the regulatory authorities of the Commonwealth in violation of the aforesaid statute and regulatory standards, and therefore these signs are considered illegal and unenforceable. These actions were taken under the color of law within the meaning of the Federal Civil Rights Act, 42 U.S.C. § 1983.

80.     As a direct and proximate result of their acts as set forth above, the Selectmen threatened to deprive, and deprived Mr. Belezos of his property and liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

81.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Belezos claims all damages, costs and attorney's fees that he is entitled by law to recover from the Selectmen for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Selectmen under the color of law in violation of Mr. Belezos's federal constitutional rights.

**COUNT V**

Failure to Adequately Train, Supervise and Discipline

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the United States Constitution as secured by 42 U.S.C. § 1983)

82.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

83.     Upon information and belief, it is the policy, custom, or practice, or all of these, of the Selectmen, to knowingly, recklessly, or with deliberate indifference and callous disregard of the applicable statutes, regulatory standards and Mr. Belezos's rights, fail to instruct, supervise, control and discipline on a continuing basis personnel under their control in their duties to refrain from unlawfully and maliciously either erecting and maintaining, causing to be erected and maintained, or failing to remove or causing to be removed Speed Limit signs (R2-1) that purport to set forth a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18.  Said signs in fact falsely represent a special speed regulation where none exists, are unauthorized by the regulatory authorities of the Commonwealth in violation of Mass. Gen. L. ch. 90, § 18, and therefore these signs are considered illegal and unenforceable.

84.     Upon information and belief, the Selectmen had actual or constructive knowledge or, had they diligently exercised their duties to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs conspired to be done, as heretofore alleged, were about to be committed.

85.     Upon information and belief, the Selectmen had power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with deliberate indifference and callous disregard of Mr. Belezos's rights failed or refused to do so.

86.     Upon information and belief, the Selectmen directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of personnel under their control heretofore described.

45

87.     As a direct and proximate result of their acts as set forth above, the Selectmen threatened to deprive, and deprived Mr. Belezos of his property and liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

88.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Belezos claims all damages, costs and attorney's fees that he is entitled by law to recover from the Selectmen for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Selectmen under the color of law in violation of Mr. Belezos's federal constitutional rights.

## COUNT VI

Deliberate and Reckless Fabrication of False Evidence

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the United States Constitution as secured by 42 U.S.C. § 1983)

89.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

90.     Upon information and belief, it is the policy, custom, or practice, or all of these, of the Selectmen, to knowingly, recklessly, or with deliberate indifference and callous disregard of the applicable statutes, regulatory standards and Mr. Belezos's rights, issue, cause to be issued, or fail to cause not to be issued Mr. Belezos a traffic citation charging him with violation of a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18, and therefore prima facie evidence of the facts

stated therein under Mass. Gen. L. ch. 90C, § 3(A)(4).  Said citation in fact falsely represents a special speed regulation where none exists, and therefore cannot be prima facie evidence of the fact of the special speed regulation stated therein.  These actions were taken under the color of law within the meaning of the Federal Civil Rights Act, 42 U.S.C. § 1983.

91.     As a direct and proximate result of their acts as set forth above, the Selectmen deprived Mr. Belezos of his property, and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

92.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Belezos claims all damages, costs and attorney's fees that he is entitled by law to recover from the Selectmen for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Selectmen under the color of law in violation of Mr. Belezos's federal constitutional rights.

## COUNT VII

Failure to Adequately Train, Supervise and Discipline

(Civil Rights Violation of the Substantive Due Process Clause of the 14th Amendment to the United States Constitution as secured by 42 U.S.C. § 1983)

93.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

94.     Upon information and belief, it is the policy, custom, or practice, or all of these, of the Selectmen, to knowingly, recklessly, or with deliberate indifference and callous disregard of the applicable statutes, regulations and Mr. Belezos's rights, fail to instruct, supervise, control and discipline on a continuing basis personnel under their control in their duties to refrain from unlawfully and maliciously issuing Mr. Belezos a traffic citation charging him with violation of a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18, and therefore prima facie evidence of the facts stated therein under Mass. Gen. L. ch. 90C, § 3(A)(4).  Said citation in fact falsely represents a special speed regulation where none exists, and therefore cannot be prima facie evidence of the fact of the special speed regulation stated therein.

95.     Upon information and belief, the Selectmen had actual or constructive knowledge or, had they diligently exercised their duties to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs conspired to be done, as heretofore alleged, were about to be committed.

96.     Upon information and belief, the Selectmen had power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with deliberate indifference and callous disregard of Mr. Belezos's rights failed or refused to do so.

97.     Upon information and belief, the Selectmen directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of personnel under their control heretofore described.

98.     As a direct and proximate result of their acts as set forth above, the Selectmen deprived Mr. Belezos of his property, and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

99.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Belezos claims all damages, costs and attorney's fees that they are entitled by law to recover from the Selectmen for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said Selectmen under the color of law in violation of Mr. Belezos's federal constitutional rights.

## COUNT VIII

Unconstitutional Lack of Evidentiary Safeguard

(Civil Rights Violation of the Procedural Due Process Clause of the 14th Amendment to the United States Constitution and 42 U.S.C. § 1983)

100.     Mr. Belezos repeats, re-alleges and incorporates by reference the above allegations as if hereinafter set forth in full.

101.     At all relevant times, Mr. Belezos possessed a constitutionally protected property interest in both his money, license to operate and register a motor vehicle, and a constitutionally protected liberty interest in maintaining his license to operate a motor vehicle.

102.     Upon information and belief, the actions of the Selectmen were taken with reckless or callous indifference Mr. Belezos's constitutional rights.

103.    Any reasonable public official would have known that the actions of the Selectmen were in violation of the Fourteenth Amendment and the procedural due process rights of Mr. Belezos.

104.    The process provided by state law to safeguard Mr. Belezos's protected property and liberty interests, which process Mr. Belezos has exercised and lost, is not constitutionally adequate.

105.    The lack of any evidentiary proof requirement pertaining to whether a special speed regulation has been duly established in accordance with the provisions of Mass. Gen. L. ch. 90, § 18, is inadequate to ensure that the persuasive force of prima facie evidence is not improperly triggered under Mass. Gen. L. ch. 90C, § 3(A)(4) (i.e., the traffic citation shall be admissible and shall be prima facie evidence of the facts stated therein).

106.    The lack of any evidentiary proof requirement pertaining to whether a Speed Limit sign (R2-1) (designating a special speed regulation) has been duly established in accordance with the provisions of Mass. Gen. L. ch. 90, § 18, is inadequate to ensure that the persuasive force of prima facie evidence is not improperly triggered under Mass. Gen. L. ch. 90, § 17 (i.e., that operation of a motor vehicle at a rate of speed in excess of the Speed Limit sign (R2-1) shall be prima facie evidence that such speed is greater than is reasonable and proper).

107.    Upon information and belief, this lack of any evidentiary proof requirement, namely providing a special speed regulation that has been duly established in accordance with the provisions of Mass. Gen. L. ch. 90, § 18, invites the deliberate or

reckless fabrication of prima facie evidence in the form of illegally erected and unlawfully enforced Speed Limit signs (R2-1).

108.    Upon information and belief, the Selectmen are able to seize upon these evidentiary loopholes to successfully fabricate and proffer false prima facie evidence of Speed Limit signs (R2-1) purporting to designate a special speed regulation duly established in accordance with the provisions of Mass. Gen. L. ch. 90, § 18, where (in fact) there is no such special speed regulation, to interfere with Belezos's right to have his CMVI hearing in a meaningful manner, and to inflict harm upon Mr. Belezos and his interests that has not been redressed.

109.    As a direct and proximate result of their acts as set forth above, the Selectmen deprived Mr. Belezos of his property, and threatened to deprive him of his liberty, without due process of law, in violation of the guarantees of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983.

110.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Mr. Belezos claims all damages, costs and attorney's fees that they are entitled by law to recover from the Selectmen for legal deprivations, injuries and losses set forth herein, which deprivations, injuries and losses were caused by said the Selectmen under the color of law in violation of Mr. Belezos's federal constitutional rights.

**PRAYERS FOR RELIEF**

WHEREFORE, the Plaintiff Nicholas G. Belezos, individually and on behalf of all others similarly situated, respectfully requests and prays that this Honorable Court enter judgment on each and every count of this Complaint against Selectmen and members of the Defendant Class in favor of Mr. Belezos and the Plaintiff Class as follows:

1. Determine and order that this action may proceed as a class action and certify the Classes either as described above or as otherwise found by the Court to be appropriate;

2. Appoint Mr. Belezos as representative of the Plaintiff Class;

3. Appoint Selectmen as representatives of the Defendant Class;

4. Appoint counsel for Mr. Belezos as Plaintiff Class Counsel;

5. Declare that the Selectmen and the Defendant Class members' erection, maintenance and enforcement of Speed Limit signs (R2-1) in violation of Mass. Gen. L. ch. 90, § 18 (and set forth in Mass. Gen. L. ch. 85, § 2), exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore these Speed Limit (R2-1) signs are illegal and unenforceable;

6. Declare that the Selectmen and the Defendant Class members' erection, maintenance and enforcement of Speed Limit signs (R2-1) and Advisory Speed plaques (W13-1P) in violation of the "Procedures for Speed Zoning on State and

Municipal Roads" regulatory standards, exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore these Speed Limit (R2-1) signs and Advisory Speed plaques (W13-1P) are illegal and unenforceable;

7. Declare that the Selectmen and the Defendant Class members' erection, maintenance and enforcement of Speed Limit signs (R2-1) in violation of the "The Massachusetts Amendments to the 2009 Manual on Uniform Traffic Control Devices," § 10A-8 regulatory standards, exceeds the authority granted to them by the Commonwealth of Massachusetts, is ultra vires and void, and therefore these Speed Limit (R2-1) signs are illegal and unenforceable;

8. Declare that the lack of any evidentiary proof requirement pertaining to whether a special speed regulation has been duly established in accordance with the provisions of Mass. Gen. L. ch. 90, § 18, is inadequate to ensure that the persuasive force of prima facie evidence is not improperly triggered under Mass. Gen. L. ch. 90C, § 3(A)(4) or Mass. Gen. L. ch. 90, § 17, or both of these, and therefore violates the Procedural Due Process Clause of the Fourteenth Amendment to the Constitution of the United States as secured by 42 U.S.C. § 1983;

9. Order the Selectmen and members of the Defendant Class to identify and remove all unauthorized Speed Limit signs (R2-1) and nonconforming Advisory Speed plaques (W13-1P) erected or maintained on ways within their control;

53

10. Order the Selectmen and members of the Defendant Class to identify all traffic citations issued by them for violations of a special speed regulation lawfully made under the authority of Mass. Gen. L. ch. 90, § 18, on any way without having approved special speed regulations on file with MassDOT;

11. Order the Selectmen and members of the Defendant Class to identify all members of the Plaintiff Class and notify each class member of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, published notice, or all of these;

12. Order restitution or other equitable relief in favor of Mr. Belezos and members of the Plaintiff Class including a refund and return of all fines, costs, surcharges and fees collected, converted or possessed by the Selectmen and members of the Defendant Class as a result of their enforcement of the illegal and unenforceable speed limit signs;

13. Award Mr. Belezos and members of the Plaintiff Class compensatory damages, including nominal, actual, consequential and incidental damages according to proof against the Selectmen and members of the Defendant Class;

14. Award Mr. Belezos and members of the Plaintiff Class pre-judgment interest;

15. Award Mr. Belezos and members of the Plaintiff Class costs and reasonable attorney's fees; and,

16. Grant such further relief as this Honorable Court may deem equitable, just and appropriate.

## DEMAND FOR JURY TRIAL

Mr. Belezos and the members of the Plaintiff Class hereby request and demand a

jury trial, as appropriate, on all issues and claims raised in this complaint.

Respectfully submitted,

Mr. Belezos and the members of the Plaintiff Class,
by their attorney

FREDERIC P. ZOTOS


By */s/ Frederic P. Zotos*

Frederic P. Zotos, Esq.
BBO#565308
28 Old Coach Road
Cohasset, MA 02025
Tel: (781) 836-4295
E-Mail: fzotos@gmail.com

Dated: March 23, 2018


## CERTIFICATE OF SERVICE

I, Frederic P. Zotos, counsel for the plaintiff, on March 23, 2018, hereby certify
that I have served a true copy of this document upon counsel for the defendants, Joseph
A. Padolsky, 101 Summer Street, Boston, MA  02110 by electronic filing through the
United States District Court, District of Massachusetts' CM/ECF system.

*/s/ Frederic P. Zotos*
Dated: March 23, 2018                                        Frederic P. Zotos