UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NICHOLAS G. BELEZOS, on behalf
of himself and all others
similarly situated,
        Plaintiffs,

        v.                                          CIVIL ACTION NO.
                                                    17-12570-MBB

BOARD OF SELECTMEN of
Hingham, Massachusetts,
in their official capacity,
on behalf of themselves and
all others similarly situated,
        Defendants.

**MEMORANDUM AND ORDER RE:**
**DEFENDANTS' MOTION TO DISMISS**
**(DOCKET ENTRY # 13)**

**March 29, 2019**

**BOWLER, U.S.M.J.**

        Pending before this court is a motion to dismiss filed by

defendants Board of Selectmen of the Town of Hingham sued in

their official capacity ("defendants" or "Selectmen") to dismiss

all eight claims brought by plaintiff Nicholas G. Belezos, on

behalf of himself and all others similarly situated ("plaintiff"

or "Belezos").[1]  (Docket Entry # 13).  After conducting a

---

[1]  The body of the first amended complaint identifies the
Selectmen as "the Chief Elected and Executive Officers of the
Town" of Hingham, who are "sued in their official capacity . .
.."  (Docket Entry # 11, ¶ 5).  The proposed class of defendants
consists of "[t]he board of selectmen, the city council, the
transportation commission of the City of Boston, park
commissioners, a traffic commission or traffic director, or the
secretary of the Department of Transportation . . . or any

hearing, this court took the motion (Docket Entry # 13) under
advisement.

<u>PROCEDURAL BACKGROUND</u>

The amended complaint alleges the following eight causes of
action against the Selectmen: (1) a "Massachusetts Statutory
Violation" that erection of speed limit signs in violation of
section 18 of Massachusetts General Law chapter 90 ("section
18") and "set forth in" section two of Massachusetts General Law
chapter 85 ("section two") is ultra vires and therefore void
(Count I); (2) a "Massachusetts Regulatory Standards Violation"
of "'Procedures for Speed Zoning on State and Municipal Roads'"
that erection of speed limit signs is ultra vires ("Count II");
(3) a "Massachusetts Regulatory Standards Violation" of "'The
Massachusetts Amendments to the 2009 Manual on Uniform Traffic
Control Devices'" that erection of speed limit signs is ultra
vires (Count III); (4) a "Deliberate and Reckless Fabrication of
False Evidence" to erect speed limit signs without regulatory
authority in violation of the Due Process Clause of the
Fourteenth Amendment under 42 U.S.C. § 1983 ("section 1983")
(Count IV); (5) a corresponding failure to train, supervise, and

_____

public official" of Massachusetts "who erected or maintained
Speed Limit signs . . . designating a special speed regulation
lawfully made under the authority of Mass. Gen. L. ch. 90, ¶ 18"
(Docket Entry # 11, ¶ 60), which requires "'a thorough traffic
engineering study . . ..'" (Docket Entry # 11, ¶ 8) (quoting
Mass. Gen. Laws ch. 90, ¶ 18).

discipline in violation of the Due Process Clause of the Fourteenth Amendment under section 1983 vis-à-vis the violation of law in Count IV (Count V); (6) a "Deliberate and Reckless Fabrication of False Evidence" by issuing a traffic citation under an illegal speed limit sign in violation of the Due Process Clause of the Fourteenth Amendment under section 1983 (Count VI); (7) a corresponding failure to train, supervise, and discipline in violation of the Due Process Clause of the Fourteenth Amendment under section 1983 vis-à-vis the violation in Count VI (Count VII); and (8) an "Unconstitutional Lack of Evidentiary Safeguard" in violation of procedural due process under the Fourteenth Amendment in violation of section 1983 (Count VIII). (Docket Entry # 11).

Plaintiff first brought several substantially identical statutory and constitutional claims concerning the same speeding ticket issued to plaintiff against the same defendants in Massachusetts Superior Court (Plymouth County) ("state court") in Belezos v. Board of Selectmen of the Town of Hingham, Civil Action No. PLCV2014-01018B ("Belezos"). (Docket Entry # 15-1). The court allowed the defendants' Mass. R. Civ. P. 12(c) motion ("Rule 12(c) motion"). (Docket Entry # 8-7). A final judgment reciting the ruling and a prior allowance of a Mass. R. Civ. P. 12(b)(6) motion issued two days later on September 29, 2016. (Docket Entry # 8-7, p. 11). On appeal, the Massachusetts

Appeals Court ("MAC") upheld the dismissal on another ground, namely, that plaintiff "waived his right to contest the" ticket "by failing to pursue the remedy expressly provided for by the Legislature." (Docket Entry # 8-8, p. 4). Rather, plaintiff paid the ticket, which the MAC noted "'operate[d] as a final disposition of the matter.'" (Docket Entry # 8-8, p. 4) (quoting Mass. Gen. Laws ch. 90c, § 3). The Massachusetts Supreme Judicial Court ("SJC") denied plaintiff's application for further appellate review. (Docket Entry # 8-9). Thereafter, plaintiff filed this action in United States District Court for the District of Massachusetts ("federal court").

The eight claims in this action are also similar to the claims in two previous actions brought in federal court by plaintiff's counsel, Frederic Zotos, Esq. ("Zotos"). After unsuccessful attempts to obtain relief in state court, Zotos challenged the legitimacy of the speed limit signs in Hingham in Zotos v. Town of Hingham, et al., Civil Action No. 12-11126-JGD (D. Mass. Sept. 19, 2013) ("Zotos I"), and again in Zotos v. Town of Hingham, et al., Civil Action No. 13-13065-DJC (D. Mass. March 25, 2016) ("Zotos II"). (Docket Entry ## 8-3, 8-6). In a lengthy opinion on the merits, the court in Zotos I rejected Zotos' claims and dismissed the action. (Docket Entry # 8-3). The First Circuit upheld the dismissal. (Docket Entry # 8-4).

Zotos filed _Zotos II_ prior to the First Circuit's decision in
_Zotos I_.  (Docket Entry # 8, p. 2) (Docket Entry ## 8-4, 8-5).
On March 25, 2016, the court in _Zotos II_ issued a comprehensive
opinion and dismissed that action.  (Docket Entry # 8, p. 2)
(Docket Entry # 8-6).

STANDARD OF REVIEW

The standard of review for a Rule 12(b)(6) motion is well
established.  To survive a Rule 12(b)(6) motion to dismiss, the
complaint must contain "enough facts to state a claim to relief
that is plausible on its face" even if "actual proof of [the]
facts is improbable."  _Bell Atlantic Corp. v. Twombly_, 550 U.S.
544, 556, 570 (2007); _Miller v. Town of Wenham, Mass._, 833 F.3d
46, 51 (1st Cir. 2016).  The "standard is 'not akin to a
"probability requirement," but it" requires "more than a sheer
possibility that a defendant has acted unlawfully."  _Saldivar v.
Racine_, 818 F.3d 14, 18 (1st Cir. 2016) (internal citations
omitted).  "[a]ll reasonable inferences" are drawn "in the
pleader's favor."  _Sanders v. Phoenix Ins. Co._, 843 F.3d 37, 42
(1st Cir. 2016).

"Exhibits attached to the complaint are properly considered
part of the pleading 'for all purposes,' including Rule
12(b)(6)."  _Trans-Spec Truck Service, Inc. v. Caterpillar Inc._,
524 F.3d 315, 321 (1st Cir. 2008) (internal citations omitted).
This court may also "consider matters of public record and facts

susceptible to judicial notice." <u>U.S. ex rel. Winkelman v. CVS Caremark Corp.</u>, 827 F.3d 201, 208 (1st Cir. 2016).  It is therefore permissible to "take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand." <u>Kowalski v. Gagne</u>, 914 F.2d 299, 305 (1st Cir. 1990); <u>see</u>, <u>e.g.</u>, <u>Bluetarp Financial, Inc. v. Matrix Constr. Co., Inc.</u>, 709 F.3d 72, 78 n.4 (1st Cir. 2013) (taking judicial notice of related state court cases).  Accordingly, the Rule 12(b)(6) record (Docket Entry # 8) includes the state court pleadings and opinions regarding the relevant cases attached to defendants' motion (Docket Entry # 13) and plaintiff's opposition (Docket Entry # 15).

FACTUAL BACKGROUND

On September 28, 2011, Belezos was issued a civil motor vehicle infraction ("CMVI") for speeding by a Hingham police officer on Gardner Street in Hingham, Massachusetts "under the authority of Mass. Gen. L. ch. 90, ¶ 18." (Docket Entry # 11, ¶ 15).  The officer cited Belezos for operating a vehicle at a rate of speed in excess of a 30 mile-per-hour rate of speed as posted on "a 30 m.p.h. Speed Limit sign" on Gardner Street. (Docket Entry # 11, ¶ 15).  The only evidence presented against Belezos at a subsequent CMVI hearing was the "prima facie evidence of the fact[] stated in the citation," namely that he exceeded the posted, 30 mile-per-hour speed limit sign.  (Docket

6

Entry # 11, ¶ 17) (Docket Entry # 11-3).  "At the conclusion of
the hearing, the clerk-magistrate found" Belezos responsible for
the speeding infraction in violation of section 18 and Belezos
paid the $100 assessment.  (Docket Entry # 11, ¶¶ 18-20).

Gardner Street is understood by locals as split into two
sections:  an "upper" section which is north of Route 53 and a
"lower" section which is south of Route 53.  (Docket Entry # 11,
¶¶ 27, 29).  The citation issued to Belezos was on upper Gardner
Street.  (Docket Entry # 11-3).  Upper Gardner Street has two,
30 mile-per-hour speed limit signs on a white, reflective
rectangle with black lettering.  (Docket Entry # 11, ¶ 24).
Lower Gardner Street has seven 25 mile-per-hour signs.  (Docket
Entry # 11, ¶ 27).  At least five of these seven signs are on
yellow, square reflective plaques with black lettering.  (Docket
Entry # 11, ¶ 27).  Three of the five plaques have an
accompanying "THICKLY SETTLED" diamond-shaped plaque, also on a
yellow reflective background with black lettering.  (Docket
Entry # 11, ¶ 27).  Upper Gardner Street has no such "THICKLY
SETTLED" signs and, as stated in the amended complaint, is not
thickly settled.  (Docket Entry # 11, ¶ 24) (Docket Entry # 15).

Turning to the relevant Massachusetts speeding laws, which
the amended complaint quotes, section two of Massachusetts
General Laws chapter 85 ("chapter 85") authorizes cities and
towns to erect and maintain traffic signs in their jurisdiction.

7

(Docket Entry # 11, ¶ 6).  The statute reads in relevant part
that "'speed control signs may be established only in accordance
with the provisions of section eighteen of chapter ninety.'"
(Docket Entry # 11, ¶ 6) (quoting chapter 85, section two)
(emphasis omitted).

Sections 17 and 18 of Massachusetts General Laws chapter 90
("chapter 90") also govern speeds and signage along
Massachusetts roadways.  The amended complaint quotes each
statute.  Section 17 of chapter 90 ("section 17") reads in
relevant part:

> [1] No person operating a motor vehicle on any way
> shall run it at a rate of speed greater than is
> *reasonable and proper*, having regard to traffic and
> the use of the way and the safety of the public.  [2]
> *Unless a way is otherwise posted in accordance with
> the provisions of section eighteen, it shall be prima
> facie evidence of a rate of speed greater than is
> reasonable and proper as aforesaid* (1) if a motor
> vehicle is operated on a divided highway outside a
> thickly settled or business district at a rate of
> speed exceeding fifty miles per hour for a distance of
> a quarter of a mile, or (2) on any other way outside a
> thickly settled or business district at a rate of
> speed exceeding forty miles per hour for a distance of
> a quarter of a mile, *or (3) inside a thickly settled
> or business district at a rate of speed exceeding
> thirty miles per hour for a distance of one-eighth of
> a mile*, or . . ..  [4] If a speed limit has been duly
> established upon any way, in accordance with the
> provisions of said section, operation of a motor
> vehicle at a rate of speed in excess of such limit
> shall be prima facie evidence that such speed is
> greater than is reasonable and proper; . . ..

Mass. Gen. Laws ch. 90, § 17 (emphasis added); (Docket Entry #
11, ¶ 11) (emphasis as to certain language in section 17

omitted).  In contrast to section 17, section 18 "permits the imposition of a different speed limit so long as certain procedures are followed."  <u>Police Dep't of Hingham v. Zotos</u>, 2012 WL 1689189, at * 1 (Mass. App. Ct. May 16, 2012).  Section 18 reads in pertinent part:

> The city council, the transportation commission of the city of Boston, the board of selectmen, park commissioners, a traffic commission or traffic director, or the department, on ways within their control, may make special regulations as to the speed of motor vehicles and may prohibit the use of such vehicles altogether on such ways . . . No such regulation shall be effective until there shall have been erected . . . signs, conforming to standards adopted by the department, setting forth the speed or other restrictions established by the regulation . . ..

Mass. Gen. Laws ch. 90, § 18.  Based on the enabling authority in section 18, the Massachusetts Department of Transportation Highway Division ("MassHwy") promulgated the aforementioned regulatory standards entitled "Procedures for Speed Zoning on State and Municipal Roadways" ("MassHwy Procedures").  (Docket Entry # 11-1).  That document explains the process of obtaining a traffic engineering study which, in turn, leads to an approved "Special Speed Regulation" that allows the posting of a numerical speed limit sign on a Massachusetts roadway such as Gardner Street.  (Docket Entry # 11, ¶ 8(a)) (Docket Entry # 11-1).  In pertinent part, it reads as follows:

> Chapter 90, *Section 18 authorizes the posting of*
> *numerical speed limits on all roadways in*
> *Massachusetts.  The foundation for the actual posting*
> *of a speed limit is a thorough traffic engineering*
> *study*.  After a study has been completed, a Special
> Speed Regulation is drafted and approved by the
> governing authority of the roadway, the Registry of
> Motor Vehicles and MassDOT.  All posted regulatory
> speed limit signs must adhere to this approval
> process.  *If a speed limit is posted without this*
> *procedure, it is in violation of Chapter 90, Section*
> *18, and is therefore considered illegal and*
> *unenforceable.*

(Docket Entry # 11-1, pp. 4-5) (emphasis added);[2] (Docket Entry #

11, ¶ 8) (quoting above with emphasis added to first and last

sentences).  Indeed, the MassHwy Procedures emphasizes the

foundational requirement of an engineering study for speed limit

signs.  (Docket Entry # 11-1, p. 3) ("[s]peed limits shall be

established only after an engineering and traffic investigation

has been conducted"); (Docket Entry # 11-1, p. 3)

("comprehensive engineering study" is "prerequisite to

establishing speed regulations and posting speed limits");

(Docket Entry # 11, ¶ 41) (emphasis omitted).

    "The Massachusetts Amendments to the 2009 Manual on Uniform

Traffic Control Devices" ("MUTCD") also addresses the regulatory

standards for speed limit signs.  (Docket Entry # 11-2).  Quoted

at length in the amended complaint, the MUTCD explains the "85-

---

[2]  Page numbers refer to the docketed page.

percentile method" and the process for a city or town to erect an enforceable speed limit sign:[3]

Section 10A-8 Speed Control

Of the special regulations adopted by municipalities under the provisions of Chapter 90, Section 18 of the General Laws, the most commonly used is the special regulation of the speed of motor vehicles. Considerable data including speed observations and trial runs must be obtained by municipal officials, usually the Police Department. *The final determination is based upon the 85-percentile method, which is that speed at or below which 85% of the vehicles observed were actually traveling.* Department representatives are available to demonstrate the proper method for conducting the necessary studies and drafting the covering regulation, upon written request of local offices.

Procedure for Establishment of Legal Speed Zones

(1) The municipality is to conduct proper studies and submit data to the Department. (Municipalities usually accept the available services of the Department in conducting studies and assembling the data).

(2) After the speed zones, proposed by the local authorities, are reviewed by the Department, they are returned to the municipality for formal adoption by the rule-making body. During this time, the municipality is responsible for any and all hearings required for adoption.

(3) Upon receipt of notice of formal adoption by the municipality, the Department, acting jointly with the Registry, will certify and approve.

(4) Certified regulation is returned to municipality.

---

[3] The MassHwy Procedures likewise address the 85-percentile method and the process for a municipality to erect a legal and enforceable speed limit sign. (Docket Entry # 11-1, pp. 5-15, 21).

(5) Official Speed Limit signs may then be installed
in accordance with the specific provisions of the
approved speed regulation.

(6) The Special Speed Regulation is then enforceable
against violators.

(Docket Entry # 11-2, pp. 11-12) (emphasis added); (Docket Entry

# 11, ¶ 10) (quoting above language and emphasizing certain

portions).

The MassHwy Procedures defines "Speed Limit signs" as

"rectangular in shape, with black numerals on a white

reflectorized background." (Docket Entry # 11-1, p. 22) (Docket

Entry # 11, ¶ 8(c)) (emphasis omitted). The MassHwy Procedures

also addresses advisory speed limit signs, which are yellow in

color with black numerals. (Docket Entry # 11, p. 6). Advisory

speed limit signs or so-called "Advisory Speed plaque[s]" "shall

not be installed until the advisory speed has been determined by

an engineering study." (Docket Entry # 11-1, p. 19) (emphasis

omitted); (Docket Entry # 11, p. 7) (emphasis omitted). In

addition, "[t]he Advisory Speed plaque shall only be used to

supplement a warning sign and shall not be installed as a

separate sign installation." (Docket Entry # 11-1, p. 19)

(emphasis omitted); (Docket Entry # 11, p. 7) (emphasis

omitted). As also stated in the MassHwy Procedures:

Unlike regulatory speed signs, advisory speed signs can be
erected by municipalities without any further approval
provided they comply with the M.U.T.C.D. *Also, advisory
speeds are not enforceable, since their intent is to advise*

*motorists of an appropriate speed through a particular*
*condition, not regulate it.*

(Docket Entry # 11-1, pp. 19-20) (emphasis added and underlining
omitted); (Docket Entry # 11, p. 8) (quoting above language with
emphasis).

As stated in a January 2012 letter from Mary-Joe Perry, the
district highway director of MassHwy District 5, to Zotos, a
search of "the District's Records" found no evidence that a
special speed regulation "was ever issued" for Gardner Street.
(Docket Entry # 11-9). Minutes of an August 2015 meeting
submitted by a Traffic Committee of the Town of Hingham to the
Board of Selectman state that:

> The Lower Gardner Street Association is requesting
> signs for speed enforcement as well as an extension of
> the sidewalk. There are currently 30 MPH speed signs
> but there is no record of them. Most residential
> neighborhoods have a speed limit of 30 MPH as it is
> and this neighborhood is thickly settled as well.
> Sgt. Horte conducted a speed study and found the
> average speed travelled is 37 MPH which is not
> excessive. The signs which are currently posted are
> not permitted but are still enforceable. The question
> is whether they are challenged in court, if it would
> they would be found to be illegal and the Town might
> be sued. Sgt. Horte has contacted Town Counsel about
> this and will be speaking with them this week.

(Docket Entry # 11-10) (Docket Entry # 11, ¶ 28) (emphasis
omitted). As to Gardner Street, "the 85th percentile speed of
motor vehicles travelling" on the street "is greater than 40
m.p.h., which is also greater than" either of the posted 30
mile-per-hour and 25 mile-per-hour speed limit signs on the

street.  (Docket Entry # 11, ¶ 29).  A 2012 "GPS Survey [of]
Posted Speed Limits [for the] Town of Hingham" conducted by
Zotos, plaintiff's current counsel, reflects that 66% of the
speed limit signs surveyed under the town's jurisdiction "lacked
a required Special Speed Regulation."  (Docket Entry # 11-8, pp.
1-2).  As stated in the amended complaint, there are at least 26
speed limit signs "posted on the public roadways under the sole
jurisdiction of the Town of Hingham" which do not have "approved
special speed regulations on file with MassDOT," presumably at
the time Belezos filed the amended complaint in March 2018.
(Docket Entry # 11, ¶ 30) (citing the 2012 GPS Survey, table
three, at pp. 5-6, listing 60 signs without special speed
regulations).  In an August 2012 letter to the "Board of
Selectmen" of the "Town of Hingham," i.e., defendants, Neil
Boudreau ("Boudreau"), a state traffic engineer, acknowledged
receipt of a July 2012 letter and the GPS survey from Zotos.
(Docket Entry # 11, ¶ 40) (Docket Entry # 11-16, p. 1).  Citing
table three in the GPS survey, Boudreau's letter to the
Selectmen notes that the Massachusetts Department of
Transportation "is required . . . to give chapter 85, 'Section 2
Notice to the Town of Hingham regarding the special speed
regulations listed as improperly installed.'"  (Docket Entry #
11, ¶ 40) (Docket Entry # 11-16, p. 3).

From September 28, 2011 to January 28, 2018, the Town
issued 1,247 traffic citations on roadways in Hingham that did
not have "approved special speed regulations on file with
MassDOT."  (Docket Entry # 11, ¶ 33(a)).  The amended complaint
seeks to certify a class of individuals who received traffic
citations for violating "a special speed regulation lawfully
made under the authority of [section 18], i.e., operating a
vehicle at a rate of speed in excess of a Speed Limit sign (R2-
1), where (in fact) there is no such approved special speed
regulation, and who . . . suffered or experienced an adverse
legal consequence . . . from September 28, 2011, to the date of
the judgment in this action."  (Docket Entry # 11, ¶ 58).

DISCUSSION

Defendants move to dismiss all eight counts on the grounds
of claim preclusion, the merits, and the Rooker-Feldman
doctrine.  (Docket Entry # 14).  Plaintiff opposes dismissal.
(Docket Entry # 15).

A.  Claim Preclusion

Defendants maintain that the Belezos decision bars
relitigation of the claims raised in the amended complaint in
Belezos and those that plaintiff could have raised.  (Docket
Entry # 14).  Plaintiff points out that he "no longer seeks
vacatur of his traffic citation" although "he continues to seek
declaratory relief that the Selectmen's erection and enforcement

of unauthorized speed limit signs violates the applicable
statutes and regulatory standards, and therefore these signs are
illegal and unenforceable."  (Docket Entry # 15, p. 6).
Plaintiff also submits that the MAC's decision and judgment in
Belezos on appeal did not address the merits (Docket Entry # 8-
8) ("[i]t is unnecessary to reach the merits of Belezos's
claims") and supersedes the preclusive effect of the trial
court's judgment.  (Docket Entry # 15).

     "'Under federal law, a federal court must give to a state-
court judgment the same preclusive effect as would be given that
judgment under the law of the state in which that judgment was
entered.'"  McDonough v. City of Quincy, 452 F.3d 8, 16 (1st
Cir. 2006) (quoting Torromeo v. Fremont, 438 F.3d 113, 115 (1st
Cir. 2006)).  Accordingly, Massachusetts law determines the
effect of the state court judgment in Belezos as a bar to this
section 1983 action.  Giragosian v. Ryan, 547 F.3d 59, 63 (1st
Cir. 2008) (Massachusetts law determines "whether appellant's §
1983 action is barred by the doctrine of res judicata").

     In Massachusetts, claim preclusion "'prevents relitigation
of all matters that were or could have been adjudicated in the
action.'"  Kobrin v. Bd. of Registration in Med., 832 N.E.2d
628, 634 (Mass. 2005) (internal citations omitted).  It "is
based on '[c]onsiderations of fairness and the requirements of
efficient judicial administration,' which 'dictate that an

opposing party in a particular action as well as the court is
entitled to be free from attempts to relitigate the same
claim.'" <u>DeGiacomo v. City of Quincy</u>, 63 N.E.3d 365, 368–69
(Mass. 2016) (addressing "res judicata," which encompasses claim
and issue preclusion); <u>Santos v. U.S. Bank Nat'l Ass'n</u>, 54
N.E.3d 548, 554 (Mass. App. Ct. 2016) (claim preclusion based on
premise "that the party to be precluded has had the incentive
and opportunity to litigate the matter fully in the first
lawsuit"); <u>see</u> <u>also</u> <u>Anderson v. Phoenix Inv. Counsel of Boston,
Inc.</u>, 440 N.E.2d 1164, 1167 (Mass. 1982) (both claim and issue
preclusion "'relieve parties of the cost and vexation of
multiple lawsuits, conserve judicial resources, and, by
preventing inconsistent decisions, encourage reliance on
adjudication'") (quoting <u>Allen v. McCurry</u>, 449 U.S. 90, 94
(1980)).

Under Massachusetts law, claim preclusion requires three
elements:  "'(1) the identity or privity of the parties to the
present and prior actions; (2) identity of the cause of action;
and (3) prior final judgment on the merits.'" <u>RFF Family
P'ship, LP v. Ross</u>, 814 F.3d 520, 531–32 (1st Cir. 2016)
(internal citations omitted).  Identity of the parties exists

because plaintiff brought both the <u>Belezos</u> action and this action against the same defendants.[4]

As to the second element and as explained in an oft-cited Massachusetts appeals court case, "A claim is the same for res judicata purposes if it is derived from the same transaction or series of connected transactions." <u>Saint Louis v. Baystate Med. Ctr., Inc.</u>, 568 N.E.2d 1181, 1185 (Mass. App. Ct. 1991) (citing, inter alia, <u>Restatement (Second) of Judgments</u> § 24(1) (1982)). The assessment of "'[w]hat factual grouping constitutes a "transaction", and what groupings constitute a "series",'" is "'"determined pragmatically."'" <u>Saint Louis v. Baystate Med. Ctr., Inc.</u>, 568 N.E.2d at 1185 (quoting <u>Restatement (Second) of Judgments</u> § 24(2) (1982)). More narrowly, claims are identical for purposes of claim preclusion "if they are based on 'the same transaction, act, or agreement, and seek redress for the same wrong.'"[5] <u>Ajemian v. Yahoo!, Inc.</u>, 987 N.E.2d 604, 610 (Mass. App. Ct. 2013), <u>cert. denied</u> 138 S. Ct. 1327 (2018) (internal citations and brackets omitted). Overall, "[c]laim preclusion applies 'even though the claimant is prepared in a second action to present different evidence or legal theories to support his

---

[4] The proposed plaintiff classes cover a different time period. The body of the amended complaint in <u>Belezos</u> adds additional defendants not included in the case at bar.
[5] Under either framework, the second element is met in the case at bar.

claim.'" Bagley v. Moxley, 555 N.E.2d 229, 232 (Mass. 1990)
(internal citation omitted); accord Massaro v. Walsh, 884 N.E.2d
986, 990 (Mass. App. Ct. 2008).

Examining the amended complaints evidences the identicality
of the claims. See generally Massaro v. Walsh, 884 N.E.2d at
990 ("[c]omparison of the complaints reveals that the doctrine
of claim preclusion applies"). In Belezos, plaintiff challenged
defendants' statutory authority to post the 30-mile-per-hour
speed limit signs on Gardner Street (and other public roadways
in Hingham) without a traffic engineering study under "'the 85-
percentile method'" or a special speed regulation in accordance
with the MUTCD and MassHwy Procedures promulgated under the
enabling authority of sections two and 18. (Docket Entry # 15-
1, ¶¶ 4, 23-24, 26, 27, 33, 34, 40). The Belezos amended
complaint does not limit the statutory and constitutional claims
to Gardner Street and the deficient speed limit signs on that
street.[6] (Docket Entry # 15-1, ¶ 4, 33-39, 50). Quoting section
17, the amended complaint in Belezos alleges that defendants
lacked the statutory authority to post and enforce the speed

---

[6] The Belezos amended complaint fails to identify these Hingham
roadways by name. The claims in the amended complaint in this
action are not limited to Gardner Street and the speed limits
signs on that street. As discussed below, the amended complaint
identifies the Hingham roadways and relies on documents in
existence when Belezos filed the amended complaint in the
Belezos action.

limit signs. (Docket Entry # 15-1, ¶¶ 30, 35, 95-96).

Plaintiff's September 28, 2011 speeding citation provided the

basis for the challenges. (Docket Entry # 15-1, ¶¶ 42-50). The

amended complaint also raised class allegations and sought class

certification of a plaintiff class of Massachusetts residents

receiving speeding citations based on illegal and unenforceable

speed limit signs in violation of the MassHwy Procedures and the

MUTCD. (Docket Entry # 15-1, ¶¶ 51-59)). Finally, as stated in

the Belezos amended complaint, town policies grounded on

widespread practices of the Board of Selectmen, i.e.,

defendants, include routinely enforcing the speed limit signs by

issuing traffic citations. (Docket Entry # 15-1, ¶¶ 17, 35-37,

41, 44).

In the case at bar, plaintiff complains about the same

process, or lack thereof, on the part of the same defendants in

erecting and enforcing the 30-mile-per-hour speed limit signs on

Gardner Street (including the "advisory" 25-mile-per-hour signs)[7]

without the foundation of a traffic engineering study and a

---

[7] The amended complaint identifies five traffic citations for
speeding in excess of "Advisory Speed Plaques," four of which
predate the amended complaint in Belezos. (Docket Entry # 11, ¶
36). The fifth traffic citation predates the September 27, 2016
ruling on defendants' Rule 12(c) motion by four months. (Docket
Entry # 11, ¶ 36) (Docket Entry # 8-7). In setting out the
class action allegations, the amended complaint in Belezos does
not distinguish between advisory signs and so-called "R2-1"
speed limit signs denoted in the amended complaint in this
action.

special speed regulation in contravention of the MassHwy

Procedures and the MUTCD enacted under the enabling statutes,

sections two and 18.  (Docket Entry # 11, ¶¶ 6-10, 12, 27, 15,

24-28, 33).[8]  Other posted speed limit signs and/or advisory

speed plaques on Hingham roadways also lack the foundation of a

traffic engineering study and/or a special speed regulation.  In

particular, the amended complaint identifies by name the

following Hingham roadways as having speed limit signs,

including advisory speed plaques, that lack the foundation of an

engineering study and/or a special speed regulation:  Cushing

Street (Docket Entry # 11, ¶ 42) (citing June 2011 Massachusetts

Department of Transportation Road Safety Audit (Docket Entry #

11-17)); Beal Street, West Street, and Fort Hill Street (Docket

Entry # 11, ¶¶ 34, 45-47) (citing July 2006 Town of Hingham

Corridor Study (Docket Entry # 11-19) and the 2012 GPS Study by

Zotos (Docket Entry # 11-8));[9] Bear Cove Park Drive (Docket Entry

---

[8]  The amended complaint in the case at bar more frequently cites
and relies upon section two than the amended complaint in
Belezos does.
[9]  The aforementioned 2012 GPS Survey by Zotos, which existed
well before plaintiff filed the amended complaint in Belezos,
likely supports the allegation in the Belezos amended complaint
that 60 speed limit signs on Hingham roadways lacked a record of
special speed regulations.  (Docket Entry # 15-1, ¶ 34) ("there
are sixty (60) speed limit signs on the public roadways in the
Town of Hingham for which there is no record of any special
speed regulations (either in the Town or the MassDOT files)
having been formally adopted in accordance with the applicable
statutes and procedures"); (Docket Entry # 11-8, p. 2) (noting
Zotos' identification of "sixty (60) speed limit signs for which

# 11, ¶¶ 31, 34) (citing May 2010 Board of Selectmen minutes that proposed speed signs for the drive "cannot be enforced" (Docket Entry # 11-11), and 2012 GPS Study by Zotos (Docket Entry # 11-8)); Free Street, Longmeadow Road, Prospect Street, Shipyard Drive, French Street, Grenadier Road, Martins Lane, North Street, Ship Street, Spring Street, Water Street, and Tuckers Lane (Docket Entry # 11, ¶¶ 30, 34 (citing 2012 GPS Study by Zotos (Docket Entry # 11-8)); Conservatory Park (Docket Entry # 11, ¶ 35 (citing May 2014 Board of Selectmen minutes); South Street (Docket Entry # 11, ¶¶ 37-38) (citing 2012 Board of Selectmen minutes for two 2012 meetings); and High Street (Docket Entry # 11, ¶ 39) (citing February 2016 Board of Selectman minutes).  Plaintiff had ample means to develop claims based on these Hingham roadways when he filed the December 2014 amended complaint or, as to High Street, prior to the September 27, 2016 ruling on defendants' Rule 12(c) motion in Belezos.  See Saint Louis v. Baystate Med. Ctr., Inc., 568 N.E.2d at 1186 (claim preclusion "recognizes that the same policy applies when a specific rearticulation of the claim (through expression of a new theory of grounds for relief), arising out of the same life situation, could have been, but was not, raised in the prior litigation") (citing Restatement (Second) of Judgments § 24 cmt.

---

there was no record (either in the Town or the Mass DOT files) of any Special Speed Regulations having been issued").

a, b (1982); see Restatement (Second) of Judgments § 24 cmt. a,
¶ 4, and cmt. b., ¶ 3 (1982).  As explained previously, the
Belezos amended complaint encompasses Hingham roadways other
than Gardner Street.  (Docket Entry # 15-1, ¶ 4, 33-39, 50).

Plaintiff's September 28, 2011 speeding ticket on Gardner
Street, its enforcement, and the street's lack of a special
speed regulation to support the signs again play a prominent
role in this action.[10]  (Docket Entry # 11, ¶¶ 15-20, 24-26)
(Docket Entry # 11-3).  As in Belezos, the Selectmen knew or
constructively knew about the speed limit signs on Gardner
Street and the fact that there was no special speed regulation
"pertaining thereto."  (Docket Entry # 11, ¶ 26) (Docket Entry #
15-1, ¶¶ 41, 44).  In both Belezos and this action, town
policies of the Board of Selectmen, i.e., defendants, include
failing to remove or erecting speed limit signs that lack a
special speed regulation; failing to train, supervise, and

---

[10]  The case at bar includes the additional facts of the Board of
Selectmen's August 2015 minutes not in existence at the time
plaintiff filed the amended complaint but in existence prior to
the court's merits' based decision in Belezos.  (Docket Entry #
11, ¶ 28) (Docket Entry # 8-7).  The amended complaint also adds
the fact of a traffic citation issued in December 2014 to an
individual for traveling in excess of a posted speed limit on
Bare Cove Park Drive in Hingham.  (Docket Entry # 11, ¶ 32).
Mindful of the policies that underlie claim preclusion in
Massachusetts, these additional facts supporting the same
transaction or series of transactions do not preclude the
application of claim preclusion.  See Saint Louis v. Baystate
Med. Ctr., Inc., 568 N.E.2d at 1185; Heacock v. Heacock, 520
N.E.2d 151, 153 (Mass. 1988).

discipline Town of Hingham personnel to remove or erect speed

limit signs that lack a special speed regulation; issuing

plaintiff traffic citations for violating a special speed

regulation made under section 18 when, in fact, the sign lacked

a foundational special speed regulation; failing to train,

supervise, and discipline regarding issuing such traffic

citations; and allowing a lack of evidentiary safeguards by not

having a special speed regulation pertaining to posted signage

on Gardner Street and various other Hingham roadways.  (Docket

Entry ## 11, 15-1).

    Overall, the <u>Belezos</u> action is founded upon the same legal

rights of defendants' statutory non-compliance and

unconstitutional conduct of erecting and enforcing speed limit

signs on Gardner Street and other Hingham roadways that

plaintiff seeks to litigate in piecemeal fashion in the case at

bar.[11]  <u>See</u> <u>Fassas v. First Bank & Trust Co. of Chelmsford</u>, 233

N.E.2d at 925 ("question in the instant case is not only whether

the plaintiffs' present theory could have been pressed under the

pleadings in the prior suit, but whether the two suits are

founded on the violation of the same legal rights").  In light

---

[11]  In the present motion, defendants do not address class
certification.  Instead, they moved for an extension of time to
address plaintiff's motion for class certification after this
court's ruling on the motion to dismiss.  (Docket Entry # 19).
This court allowed the extension.

of the above, the second element of claim preclusion is satisfied. See generally Bagley v. Moxley, 555 N.E.2d at 232 ("gravamen of the plaintiffs' complaint in both *Bagley II* and *Bagley III* was the same; the plaintiffs claimed ownership of the disputed land"); Fassas v. First Bank & Trust Co. of Chelmsford, 233 N.E.2d at 925 ("it appears that all the facts relating to possible noncompliance" as to foreclosure "were known to the plaintiffs at the time of the prior suit" alleging fraud in issuing the note and mortgages); Brown v. Healey, Civil Action No. 16-10983-IT, 2017 WL 2903222, at *2 (D. Mass. July 7, 2017) (equal protection claim challenging state gun licensing scheme arose out of same act and sought redress for same wrong as state court action challenging denial of plaintiff's renewal application); Danastorg v. US Bank Nat'l Ass'n, Civil Action No. 15-11512-ADB, 2017 WL 841274, at *5 (D. Mass. Mar. 2, 2017) (finding identicality inasmuch as claims in each action "arise out of the parties' conduct in connection with the Agreement, including Danastorg's attempts to purchase the Property and her dissatisfaction with US Bank's performance under the Agreement").

Furthermore, the fact that plaintiff does not seek to vacate the September 28, 2011 traffic conviction in the case at bar does not preclude the application of claim preclusion to this action because this action derives from the same

transaction and series of connected transactions of defendants'
enforcement and erection of speed limit signs on Gardner Street
and seeks redress for the same wrong.  In fact, plaintiff admits
that "he *continues* to seek declaratory relief that the
Selectmen's erection and enforcement of unauthorized speed limit
signs violates the applicable statutes and regulatory standards,
and therefore these signs are illegal and unenforceable."[12]
(Docket Entry # 15, p. 6) (emphasis added).

　　　Turning to the third element, the trial court in Belezos
decided the statutory ultra vires and constitutional section
1983 claims on the merits (Docket Entry # 8-7, pp. 2-10) and
entered a final judgment on the merits (Docket Entry # 8-7, p.
11).  See generally In re Sonus Networks, Inc., 499 F.3d 47, 60
& n.6 (1st Cir. 2007) (discussing "'on the merits'" for purposes
of issue preclusion and, to a lesser degree, claim preclusion).
In pertinent part, the opinion reads as follows:

> 　　　The core issue raised again by Zotos, now on behalf
> of Belezos, is:  Did Hingham have the right to install
> that sign, and did the Hingham police have the authority
> to enforce a speed limit on Gardner St[.]?  For the benefit

---

[12]  The declaratory relief sought in Belezos and in the case at
bar is strikingly similar.  (Docket Entry # 15-1, pp. 49-52)
(Docket Entry # 11, pp. 52-54).  In any event, plaintiff fails
to sufficiently argue that claim preclusion does not apply to
actions seeking declaratory relief thereby waiving any such
argument.  See Curet-Velázquez v. ACEMLA de Puerto Rico, Inc.,
656 F.3d 47, 54 (1st Cir. 2011) ("[a]rguments alluded to but not
properly developed before a magistrate judge are deemed
waived"); Coons v. Indus. Knife Co., Inc., 620 F.3d at 44.

> of Belezos and for posterity, the court shall echo the
> historic findings made earlier against Zotos, and now
> states without equivocation, "Yes, they did."
>
> . . . Each of the constitutional challenges by Belezos must
> suffer the same fate as those raised by Zotos, for they are
> the same.  I cite to the decisions of Magistrate Dein and
> Judge Casper with their exhaustive analysis of those claims
> and their rulings in favor of Hingham.  But, to make this
> record clear, I find that Hingham and its police department
> did not violate any substantive or procedural rights of
> Belezos, they did not fabricate evidence, nor did they
> apply a defective evidentiary standard, they did not fail
> to train[,] supervise or discipline their officers, they
> did not unjustly enrich themselves, they did not in any way
> violate the equal protection provision of our Constitution,
> violate his civil rights, or do anything to "shock the
> judicial conscience."  All counts in the First amended
> Complaint are **DISMISSED**.

(Docket Entry # 8-7, pp. 4-6).  The final judgment recites the

decision and two other rulings and dismisses the complaint of

"Belezos, on behalf of himself and all others similarly situated

. . .."  (Docket Entry # 8-7, p. 11).

     Plaintiff nevertheless maintains there was no judgment on

the merits because the MAC affirmed the trial court on a

different ground by stating "It is unnecessary to reach the

merits of Belezos's claims because he waived his right to

contest the civil motor vehicle infraction . . .."  (Docket

Entry # 8-8) (Docket Entry # 15, p. 22).  Citing a First Circuit

decision addressing Massachusetts issue preclusion, In re

Baylis, 217 F.3d 66, 70-71 (1st Cir. 2000) (quoting Restatement

(Second) of Judgments § 27 cmt. o (1982)), plaintiff argues that

27

"the MAC's judgment" in Belezos "supersedes" the trial court's

judgment.  (Docket Entry # 15, p. 22).

As explained in Baylis, if the trial court's judgment is

based on two issues, either one of which provides sufficient

standing "'to support the result,'" Restatement (Second) of

Judgments § 27 cmt. i, o (1982), and "'the appellate court'

affirms on one ground and passes on the other, 'the judgment is

conclusive only as to the first determination.'"  In re Baylis,

217 F.3d at 71 (quoting Restatement (Second) of Judgments § 27

cmt. o (1982)) (internal brackets omitted).  Baylis is

distinguishable because the trial court in Belezos did not enter

a judgment based on two issues, either one of which "'standing

independently would be sufficient to support the result.'"  Id.

at 71 (quoting Restatement (Second) of Judgments § 27 cmt. i

(1982)).  In affirming the trial court, the MAC did not

adjudicate one of two alternative grounds for the trial court's

judgment.  Rather, it affirmed the trial court based on an

entirely different ground.  Issue preclusion applies in such

circumstances.  Klimowicz v. Deutsche Bank Nat'l Tr. Co., 264 F.

Supp. 3d 309, 317 (D. Mass. 2017), aff'd, 907 F.3d 61 (1st Cir.

2018).  The court in Klimowicz rejected the plaintiff's argument

"that the determination of the issue did not have the level of

finality sufficient to apply the doctrine of issue preclusion

because her appeal was dismissed for failure to post a bond"

even though the lower court considered the merits and entered a
judgment which was subject to appeal. Id. at 317 & n.6
("Plaintiff had an opportunity to appeal the judgment is
sufficient to satisfy the final judgment requirement under
Massachusetts law").

Furthermore, the matter before this court involves the
application of claim preclusion rather than issue preclusion.
Claim preclusion applies to a final judgment even if it is
subject to an appeal. Restatement (Second) of Judgments § 13
cmt. f (1982). If the appeals court reverses the trial court,
the trial court's "judgment ceases to be final." Id. The MAC
did not reverse the trial court's judgment. Rather, it affirmed
the judgment for a different reason. Moreover, unlike the
higher court in Baylis, which questioned the lower court's
alternative ruling, see In re Baylis, 217 F.3d at 71, the MAC's
decision in Belezos did not question the trial court's ruling.

In sum, claim preclusion bars litigation or relitigation of
all of plaintiff's individual claims.

B.   The Merits

In the alternative, the merits of plaintiff's substantive
and procedural due process claims in counts IV to VIII under
section 1983 are subject to dismissal on the merits.

1.  Substantive Due Process

The substantive component of the due process clause
prescribes "certain offensive government actions 'regardless of
the fairness of the procedures used to implement them.'"
Aguilar v. United States Immigration and Customs Enforcement
Division of the Dep't of Homeland Sec., 510 F.3d 1, 21 (1st Cir.
2007) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)).
A violation of substantive due process occurs "from state
actions that are 'arbitrary and capricious,' 'run counter to the
concept of ordered liberty,' or 'appear shocking or violative of
universal standards of decency.'"  Ford v. Bender, 768 F.3d 15,
23-24 (1st Cir. 2014) (quoting Amsden v. Moran, 904 F.2d 748,
753-54 (1st Cir. 1990)).  Put another way, the official action
is unconstitutional "'when it "can properly be characterized as
arbitrary, or conscience shocking, in a constitutional sense."'"
Espinoza v. Sabol, 558 F.3d 83, 87 (1st Cir. 2009); accord Dutil
v. Murphy, 550 F.3d 154, 160 (1st Cir. 2008) (substantive due
process violation occurs when "government's conduct is so
'egregiously unacceptable, outrageous, or conscience-shocking'
that 'the constitutional line has been crossed'") (internal
citations omitted).

In general, state action constitutes "conscience shocking"
behavior when the behavior involves "physical or psychological
abuse, or significant interference with a protected
relationship, such as the parent-child relationship."  McConkie

<u>v. Nichols</u>, 446 F.3d 258, 261 (1st Cir. 2006) (lies told by police detective during interrogation to induce confession did not shock the conscience).  The threshold for an action to qualify as conscience shocking is high.  <u>Doe v. Devonshire</u>, 181 F.Supp.3d 146, 154 (D. Mass. 2016) (student's suspended housing privileges as punishment did not shock the conscience); <u>see</u> <u>Maldonado v. Fontanes</u>, 568 F.3d 263, 273 (1st Cir. 2009) (Mayor's alleged conduct of authorizing the seizing of public housing tenants' pets did not violate the tenants' substantive due process rights); <u>accord</u> <u>McConkie</u>, 446 F.3d at 261 ("conscience-shocking executive action 'must be stunning, evidencing more than humdrum legal error'").

Counts IV to VII allege substantive due process violations respectively in erecting illegal speed limit signs and issuing the citation under the illegal speed limit sign along with corresponding failure to train, supervise, and discipline allegations.  (Docket Entry # 11).  Plaintiff submits that the violations at issue are grounded in the notion that government agents may not deliberately fabricate evidence or continue to permit wrongs, and that doing so "shocks the conscience."  (Docket Entry # 15).  Plaintiff initially alleges that the charges against him and the proposed class are false.  He compares defendants' conduct to that of the defendants in <u>Limone</u> <u>v. Condon</u>, 372 F.3d 39 (1st Cir. 2004), where the defendants

were alleged to have fabricated incriminating evidence and withheld exculpatory evidence against three men on trial for first-degree murder. The court found that by purposely suborning false testimony from a key witness and suppressing exculpatory evidence to protect the actual murderers who were being groomed as informants for the FBI, the defendants violated a fundamental concept of the American justice system. Id. at 44-45.

There are a number of significant differences between the case at bar and Limone. First and foremost, the gravity of the situations is not the same. A traffic citation is non-criminal in nature and any fabrication of evidence is simply not as significant as coercing false testimony and withholding exculpatory evidence in a first-degree murder trial. Second, contrary to plaintiff's assertion, defendants' conduct does not "mirror – in the constitutional sense – the intolerable conduct in Limone." (Docket Entry # 15). In Limone, the plaintiff was allegedly being framed for a crime that he did not commit. Id. at 44-45. The defendants, knowing that the plaintiff did not commit the crime, nonetheless fabricated evidence against him to serve an ulterior motive – protecting a future FBI informant. Id. This is substantially different from the alleged conduct of defendants in this case, in which the only use of purportedly fabricated evidence rests on the posted speed limits.

Defendants' conduct would perhaps be more in line with Limone had they *fabricated* evidence that a motorist was going faster than he or she was, which the complaint does not state or reasonably infer.  In any event, defendants' conduct here does not mirror that of Limone and does not shock the judicial conscience as they did not fabricate evidence in the manner, to the degree, and with the severe ramifications as in Limone.[13]

Plaintiff next argues that defendants fabricated evidence by posting speed limits that were lower than they should have been.  He relies on Kennie v. Nat. Res. Dep't of Dennis, 889 N.E.2d 936 (Mass. 2008), to support this assertion.  The Kennie case dealt with the Massachusetts Civil Rights Act, which requires that the defendant's words and conduct be threatening, intimidating, or coercive.  See id. at 938.  The court, in analyzing the coercive nature of the defendant's conduct, found that the defendant's statements to the plaintiff that "he was 'mandated to do whatever it takes to prevent docks' from being built in the area," taken together with his alleged conduct of placing shellfish in the area around the dock to intentionally inflate the concentration of shellfish in the area, were sufficiently coercive because the defendant knew that this would

---

[13]  In making this finding, this court recognizes that Belezos lost his job as a delivery man as a result of the speeding violation.  (Docket Entry # 11, ¶ 23).

prevent the plaintiff from getting a permit for the dock.  Id.
at 939.  It was in this context that the court stated that the
conduct would be conscience-shocking and violative of
substantive due process.  Id. at 942 n.14-15.

The case at bar differs from the circumstances in Kennie.
In Kennie, the court found enough evidence to support the
conclusion that the defendant increased the amount of shellfish
in the area to prevent the plaintiff from going forward with a
permit application.  In this case, plaintiff has not alleged
that defendants did anything to fabricate the results of the
traffic studies or anything to tamper with them.  Plaintiff's
allegation is that defendants erected at least 26 street signs
that displayed speeds lower than what the studies found or that
the studies did not exist to support the signage.  Citing no
authority, he argues that the erection of these signs "is
essentially fabricated evidence."  (Docket Entry # 15).  With no
allegations that defendants tampered with or fabricated the
results of the studies, Kennie is distinguishable and
defendants' conduct was not conscience-shocking and did not
violate plaintiff's substantive due process right.

Finally, plaintiff cites Rose v. Village of Peninsula, 839
F. Supp. 517 (N.D. Ohio 1993) ("Rose I"), and Rose v. Village of
Peninsula, 875 F. Supp. 442 (N.D. Ohio 1995) ("Rose II"), to

argue that the actual posting of these signs with incorrect speeds violates his right to substantive due process.  Both opinions are part of the same case, with Rose I addressing a motion to dismiss and Rose II addressing a summary judgment motion.  Although the case is from Ohio, Rose deals with a set of circumstances similar to the case at bar.  The plaintiff in Rose challenged a speeding citation he received for going 52 miles-per-hour on a highway with a posted speed sign of 35 miles-per-hour.  Rose I, 839 F. Supp. at 519.  Rose alleged that the speed limit for that street was statutorily set at 50 miles-per-hour, and that the defendants intentionally lowered the sign to 15 miles-per-hour in order to catch motorists speeding and generate more municipal revenue through the citations.  Id. at 525.  The court in Rose I found that this conduct could violate the plaintiff's substantive due process rights by violating his right to be free from restraint and because the motivation for lowering the speed limit signs was done for the purpose of generating revenue.  Id. at 524-525.

This case differs from Rose because the complaint does not allege or reasonably infer that defendants posted low speed limit signs for the purpose of generating municipal revenue. This "purpose" test used by the Rose court was essential to its decision that the defendants' conduct violated the Fourteenth Amendment.  The Rose I court cites the Magna Carta "as the birth

place of due process," and notes that the document was
"composed, in part, to combat enforcement of arbitrary revenue-
enhancing royal rules not substantially different in nature from
the arbitrary traffic rule enforced by defendants herein." Id.
at 525. During the summary judgment proceedings in Rose II, the
court likewise focused heavily on the "purpose" analysis. Rose
II, 875 F. Supp. at 454. The court reiterated that "the posting
and enforcement of speed limits known by the defendants to be
invalid, done with the purpose of stopping motorists to increase
Village revenues, is . . . conduct that unavoidably, and
allegedly by design, violates explicit constitutional
guarantees." Id. at 453-54. The court looked at the
circumstantial evidence of the situation, including "the fact
that the Village was in financial trouble, that the Mayor and
other officials were seeking new sources of revenue, and that
the change of speed limit signs was accomplished in a somewhat
clandestine fashion, and not pursuant to state law." Id. at
454.

Here, the complaint suggests at most that defendants, like
those in Rose, changed the speed limit signs in a somewhat
clandestine fashion. Rather than post the speed limit signs
solely to generate revenue, the complaint infers that the
purpose of the low speed limit signs was in the interest of
safety. (Docket Entry # 11). Plaintiff challenges this by

citing traffic studies that indicated the speeds were "'not excessive.'" (Docket Entry # 15, p. 18). Even if the complaint reasonably inferred that the purpose of lowering speed limits was not done in the interest of safety, it does not set out facts that allow a reasonable inference that it was done to generate revenue.

As the court concluded in both Zotos I and Zotos II, "'the defendants' alleged conduct in posting and enforcing illegal speed limit signs "did not rise to the level of conscience-shocking behavior" because the "mere violation of state law by officials seeking to increase public safety is insufficient to meet the extremely high burden necessary to show conscience-shocking behavior."'" Zotos II, Civil Action No. 13-13065-DJC (quoting Zotos I, Civil Action No. 12-11126-JGD) (Docket Entry # 8-6, p. 3). Zotos II reasoned that "[e]ven if Defendants did not comply perfectly with the statutory requirements for posting speed limits, 'liability for negligently inflicted harm is categorically beneath the threshold of [substantive] due process.'" (Docket Entry # 8-6, p. 3). The same reasoning and result applies to the substantive due process claims in the case at bar. Lastly, the dismissal on the merits of the substantive due process claims also includes the failure to train, supervise, and discipline claims. See Rivera v. Rhode Island, 402 F.3d 27, 38-39 (1st Cir. 2005) (because plaintiff "failed to

state a constitutional claim at all, her claims against the
other defendants for supervisory liability and for failure to
train fail"); <u>Estrada v. Rhode Island</u>, No. CV 07-10ML, 2008 WL
11385631, at *5 (D.R.I. Dec. 30, 2008) ("because this Court has
determined that no constitutional violation occurred, the
Plaintiffs' claim of failure 'to properly select, train,
instruct, supervise and discipline officers' necessarily
fails").

2. <u>Procedural Due Process</u>

    Turning to the procedural due process claim in Count VIII,
to survive a motion to dismiss, a plaintiff must set forth facts
in his complaint showing that:  (1) the defendants acted "'under
color of state law'"; and (2) deprived him of "'a property
interest defined by state law'"; (3) "'without adequate
process.'"  <u>Brockton Power LLC v. City of Brockton</u>, 948
F.Supp.2d 48, 67 (D. Mass. 2013) (quoting <u>Licari v. Ferruzzi</u>, 22
F.3d 344, 347 (1st Cir. 1994)).  As explained by, the Supreme
Court in <u>Zinermon v. Burch</u>:

> The constitutional violation actionable under § 1983 is not
> complete when the deprivation occurs; it is not complete
> unless and until the State fails to provide due process.
> Therefore, to determine whether a constitutional violation
> has occurred, it is necessary to ask what process the State
> provided, and whether it was constitutionally adequate.

<u>Zinermon v. Burch</u>, 494 U.S. 113, 126 (1990).

Section three of chapter 90 ("section 3"), which governs the procedure by which an individual can challenge a traffic citation, is generally recognized as comporting with the requirements of procedural due process.  See Commonwealth v. Weiss, 2004 WL 2110593 (Mass. App. Ct. Sep. 21, 2004); cf. Crawford v. Blue, 271 F. Supp. 3d 316, 328 (D. Mass. 2017) (finding mandatory filing fee requirement violated Due Process Clause).[14]  "The Constitution does not require every procedural protection that might help; it simply requires that a private person basically have a basically fair opportunity to convince the *decision maker*, by presenting proofs and arguments and evidence and replies to the arguments of others."  Newman v. Burgin, 930 F.2d 955, 961 (1st Cir. 1991).  "The basic purport of the constitutional requirement is that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  Amsden, 904 F.2d at 753 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).

---

[14]  The Crawford court determined that the section three mandatory filing fees, without the possibility of recovering the money if successful on the CMVI appeal, violated an individual's procedural due process right.  See Crawford v. Blue, 271 F. Supp. 3d at 331.  Section three filing fees are not an issue in the case at bar.

Here, plaintiff had notice of the hearings and ample opportunity to argue before the clerk-magistrate that there was an issue regarding the enforceability and legality of the speed limit signs. (Docket Entry # 11). This satisfies the procedural requirements of the Due Process Clause as giving plaintiff a meaningful manner in which to argue the merits of his case. See Gonzáles-Droz v. Gonzáles-Colón, 660 F.3d 1, 15 (1st Cir. 2011). That plaintiff was not traveling in a thickly settled area at a rate of speed exceeding 30 miles-per-hour for a distance of one-eighth of a mile, or that his rate did not exceed that of the 85th percentile as determined in the traffic study were both issues that could have been raised at the CMVI hearing or on appeal before the district court. In fact, the MAC expressly found in its appellate decision in Belezos that plaintiff failed "to pursue the remedy expressly provided for by the Legislature." (Docket Entry # 8-8, p. 4).

C.   State Law Claims

Defendants also move to dismiss the state law claims in counts I through III on the merits. (Docket Entry # 13) (Docket Entry # 14, p. 10). This court will hold the motion (Docket Entry # 13) as it pertains to dismissing these three state law claims in abeyance for a brief time period pending a determination of the motion for class certification (Docket Entry # 16).

<u>CONCLUSION</u>

In accordance with the foregoing discussion, the motion to dismiss (Docket Entry # 13) is **ALLOWED** as to the individual claims in counts IV through VIII and held in abeyance as to counts I through III for a brief time period pending a determination of the motion for class certification. Defendants are afforded up to and including April 12, 2019 to file an opposition to the motion for class certification (Docket Entry # 16). This court will conduct a hearing on the motion (Docket Entry # 16) on April 16, 2019 at 12:00 p.m.

/s/ Marianne B. Bowler
**Marianne B. Bowler**
United States Magistrate Judge